[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 95 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 96 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 97 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 98 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 99 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 100 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 101 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 103 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 104 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 105 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 106 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 107 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 108 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 110 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 111 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 112 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 113 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 114 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 115 
The most prominent question involved in this case, and that which I deem it expedient first to consider, is whether the transaction between Schermerhorn and his associates and the Trust Company was usurious. It will facilitate our inquiry and tend to give distinctness to the precise question which the case presents, to bring into view at the outset the most common forms under which the question of usury has arisen; and to notice some of the distinctions in regard to it which have been recognized and established by judicial decision. We shall thus separate this case from some which it may seem to resemble, but from which it essentially differs.
To constitute usury there must be a loan of money or its equivalent. (Dry Dock Bank v. Am. Life Ins. Trust Co., 3Comst., 361.) The common expedient resorted to, therefore, to evade the statute, is to give to the transaction the form of a sale, instead of a loan: a disguise which, whenever it can be discovered, is stripped off by the courts and the transaction declared usurious. Goods are frequently purchased upon a credit and immediately resold at a sacrifice *Page 116 
for cash for the purpose of raising money. To establish the allegation of usury in such a case, it is necessary to prove that the price agreed to be paid to the original vendor was more than the value of the goods; and, also, that a loan was intended under the form of a sale. These two facts must co-exist or there is no usury. It is obvious, therefore, that the price at which the goods are resold is of no importance except so far as it may bear upon the other questions involved. However great the sacrifice upon such resale, the transaction will not be usurious, unless the original vendor is by the contract to receive more than the actual market value of the goods. It is equally plain that however exorbitant the price agreed to be paid to such vendor, if he be ignorant of the purpose of the purchase, and the sale be not intended by him as a mere cover for a loan, there is no usury. So if one purchases of a bank the bills or notes of some other bank, which are depreciated in the market, and give his own notes for more than their market value, the same questions arise. Whether usurious or not depends upon the question whether the transaction was in reality a sale or a loan, and this is to be gathered from the situation of the parties and all the facts and circumstances of the case. But suppose instead of the notes of another bank, he receives the notes of the bank to which he applies, and these are depreciated, but he nevertheless gives his own note for them at par, can any such question arise in that case? Can usury be predicated of such a transaction? Clearly not. No question as to the value of the notes can arise, as between the bank and the borrower; because, whatever may be the value of the notes in the market, the bank is bound to redeem them at par; and it cannot be said that the bank has made a profit by taking a note for precisely the same sum that it has obligated itself to pay. Prima facie, at least, such a transaction is a loan; because, a bank cannot make a sale of its own promises to pay; which are of no value so long as they remain in the *Page 117 
possession of the bank. It is not until they have passed into other hands that they acquire a value and become possessed of the attributes of property.
It would seem hardly to require either authority or argument to prove that a person cannot sell his own promises to pay. It necessarily results from the very definition of a sale, in which all writers agree. Chancellor Kent says: "A sale is a contract for the transfer of property from one person to another for a valuable consideration." (2 Kent's Com., 468, 5th ed.) Bouvier, in his Law Dictionary, defines a sale to be "an agreement by which a man gives a thing for a price in current money." He adds: "To constitute a valid sale there must be athing sold." Long says: "Three particulars are included in a valid sale, viz: a thing which is the subject of it, a price, and the consent of parties. If the subject of the intended sale have no existence, actually or potentially, there can be no valid sale." (Long on Sales, 3.)
It is plain that the giving of one's own promise to pay to another, for any consideration, cannot be brought within these definitions of a sale. It is impossible to call such a transaction a transfer of property from one person to another, as the promise is not property in the hands of the promisor. One who executes and delivers such a note thereby makes a valid contract, viz., a contract to pay according to the tenor of the note. All that he does, i.e., both the execution and the delivery are essential to the completion of this contract; which certainly is not a contract of sale, but is supposed to be the subject of such contract. If then there is a sale, it is made by the same acts which create the thing sold. This is not only repugnant to every just definition of a sale, but logically absurd.
If then it be clear that neither individuals nor corporations can sell their mere promises to pay, the doctrine which has been deduced from the contrary assumption, viz., that upon an exchange of notes, the parties may put what relative *Page 118 
value they please upon their respective obligations, without affecting their validity, unless it is proved by extrinsic evidence that they intended the transaction as a mere cover for usury, falls to the ground. The basis upon which that doctrine rests is, that such an exchange is prima facie a mutual sale of the notes; and that evidence is required to rebut this legal presumption.
The true rule on this subject I hold to be this: that whenever the question of usury arises, no value can be put upon the promises or obligations of either party different from that which they import upon their face. This is universally conceded in respect to the obligations of the borrower. If a lender advances $90 in money, and takes a note for $100, with interest, he cannot defend himself against the charge of usury by showing that the responsibility of the borrower is doubtful, and that his notes would be worth less than par in the market. The question is to be determined upon the face of the transaction. It is usury perse. Upon what principle, then, can one who instead of the $90 in money, gives his note for $90, allege that the note he takes in return is worth less than its face? The only reason ever given is the one which has, I think, been refuted, viz., that the latter transaction is a sale, and not therefore within the statute. So, if the borrower choose to receive the promissory notes of the lender instead of money, he cannot, I think, upon the question of usury, take the ground that such notes are depreciated in the market. If he gives his own obligations for no greater nominal
amount than that for which he receives the obligations of the lender, there can be no usury. To constitute usury, the lender must take or receive, or contract to take or receive, more than the legal rate of interest; and such a project cannot be predicated upon the assumption that he will fail to redeem his own obligations.
It may be said that, admitting a mere exchange of obligations not to be a sale, neither is it a loan; and hence that it is entirely without the statute of usury, unless brought *Page 119 
within it by extrinsic evidence that an evasion of the statute was intended. It is true that literally, the transaction is neither a sale nor a loan, but an exchange. I apprehend, however, that legally, in reference to the question of usury, it must be regarded as one or the other. No other distinction has ever been applied to such transactions by the courts. If, then, it is either, it clearly results from the principle already stated which estimates the respective obligations at their nominal value, that it resembles a loan far more than a sale. This estimate is entirely incompatible with the idea of a sale, but perfectly consistent with that of a loan. Such an exchange has been sometimes said to be a "loan of credit," and as such within the statute of usury. But the opinion of Judge Gardiner inThe Dry Dock Bank v. The Am. Life Ins. Co. (3 Comst., 344), shows conclusively, 1. That credit cannot be loaned; and 2. That the statute of usury applies only to loans of money or its equivalent.
It may seem to follow from the course of reasoning here adopted that the transaction between Schermerhorn and his associates, and the Trust Company, should be treated upon the mere face of the contract, independent of all extrinsic evidence, as a loan, within the provisions of the statute. It is, however, unnecessary so to hold. The supreme court has found that it was "in substance and effect a loan of money" by the Trust Company, i.e., of its certificates of deposit or post notes, as a substitute for, and in lieu of money; a finding which I think fully warranted by the evidence; indeed I think it is not possible to come to any other conclusion.
The whole object of Schermerhorn and his associates was to raise money by way of loan, and this was well known to the officers and managers of the Trust Company. The bargain for the sale of the certificates to Mr. Biddle was made with the full knowledge of Mr. Duer, the vice-president of the Trust Company, before the certificates were issued. No case, I apprehend, can be found of an exchange of obligations under such circumstances, which has not been held to be a *Page 120 
loan; and if a loan at all, it must be a loan of money or its equivalent, as is shown by Judge Gardiner in his opinion before referred to. He says: "Every transaction of the kind, when analyzed, will be found to be a loan of money, whether disguised or not under the form of an exchange." If extrinsic evidence is necessary where the parties have exchanged their personal obligations, to prove that a loan was intended, nothing more can in my view be required than to show that the object of one of the parties was to raise money, and that this was known to the other.
It being established then that the transactions between these parties was substantially a loan of money, i.e., of the certificates or post notes of the Trust Company received by the complainant and his associates as money, the next inquiry is, was it usurious? This question is to be determined in view of the principles already advanced. It follows from those principles, that the question of usury depends in no degree upon the price at which the certificates were sold by the complainant. However great the sacrifice upon such sale, no part of the profit made enured to the benefit of the Trust Company. Nor does it depend upon the value in the market of the certificates loaned. That question arises as we have already seen, only when a loan is made under cover of a sale. The transaction here was clearly not a sale. But it depends entirely upon the relative amount of the securities exchanged, estimated at their face respectively; and in making this estimate any difference in the interest has the same effect as a difference in the principal. The position assumed by Welles, J., on this subject in The Farmers' Loan andTrust Co. v. Carroll (5 Barb., S.C.R., 616), is, I think, sound. He says: "I hold it to be law, that in all cases of a loan, where it appears upon the face of the transaction that the lender is, in any manner, to receive more than the legal rate of interest as a compensation for forbearance upon the thing loaned, it is usury per se." This is said in reference to the precise case presented here. The certificates loaned to Carroll ran *Page 121 
twenty years, and bore interest at five per cent, while Carroll was to pay interest to the company at the rate of seven per cent.
Any difference in the nominal amount of the securities exchanged has been repeatedly held in England to constitute usuryper se. (Matthews v. Griffiths, Peake's N.P. Cases, 200;Maddock v. Hammet 1 Bos. Pul., 154; Parr v.Eliason, 1 East. 92.) It makes no difference whether the discrepancy is in the principal or the interest. If it appears that, at the end of all the payments, the lender will have received more than his principal with lawful interest, the contract is usurious.
The rule which has been applied in England to grants of annuities for years, in consideration of a certain sum received, is strongly analogous in principle to that contended for here, and rests upon a similar foundation. Such an annuity is simply an agreement to pay a specific sum in instalments, and is not a sale for the same reason that the giving of a promissory note is not a sale. It has accordingly been frequently held, that in such a case the qestion of usury depends upon computation merely. In the case of Doe v. Gooch, (3 Barn. Ald., 664); Bailey, J., in reply to the counsel who had referred to the case of an annunity for life, said: "In that case the principal is in hazard from the uncertain duration of life. Here it is in the nature of an annuity for years, and there is no case in which an annuity for years has been held not to be usurious, where oncalculation it appeared that more than the principal together with legal interest is to be received." In Fereday v.Wightwick also (Russ. Myl., 45), where an annuity of £ 664.18 had been granted for the term of eleven years and a half, in consideration of the sum of £ 4000 received, the master of the rolls said: "This in effect is an agreement to repay the principal sum of £ 4000, with interest, in twenty-three instalments, and as it appears that the interest thus paid will exceed legal interest, the transaction *Page 122 
is plainly usurious." In this case an annuity for years is placed upon the same footing as any other contract to pay a certain number of instalments; and the principle asserted is, that whenever it appears on the face of the transaction that at the close of all the payments more than the sum advanced, with legal interest thereon, will have been returned, the contract is usurious. Although such a transaction is called the purchase of an annuity, yet no evidence is required to show that it is intended as a cover for a loan; because the annuity being simply an engagement by the party himself to pay a certain number of instalments, it is impossible that it should be, in the eye of the law, a sale. The question was again presented in the case ofFerguson v. Sprang (1 Ad. El., 576), where in consideration of £ 200 received, an annuity of £ 20 had been granted for sixty years. Lord Denman seemed to think that a question arose as to the value of the annuity, independent of its nominal amount; and that if the jury should find, "looking to the value of the annuity granted, that the transaction was a bonafide contract for an annuity," it might stand; but the other three judges all agreed that it was a mere matter of calculation, and that it should be submitted to a jury simply to "calculate the excess." The same doctrine was reiterated by the vice-chancellor in the case of Chillingworth v. Chillingworth
(8 Simons, 494), in which the case of Ferguson v. Sprang
was reviewed.
I consider these cases as resting upon a firm basis of principle, and as tending to establish the doctrine contended for here; that whenever the question of usury arises between the parties to any transaction, the obligations of the parties themselves cannot be estimated otherwise than at their nominal
amount; and that consequently, upon every exchange of notes or other obligations, the question of usury becomes one of mere computation.
Assuming this doctrine to be correct, it is unnecessary to go into any minute examination of facts or calculation of *Page 123 
amounts; for if the certificates be estimated at the full commercial value of the pound sterling, and to this the Trust Company is clearly entitled, including the usual rate of exchange between New-York and London on all funds which it will be necessary to remit to meet them, there would still be a very considerable difference, as is shown by the proof, between the amount of the certificates and that of the bonds taken in exchange for them, growing out of the difference of two per cent in the rate of interest; and there can be no risk in inferring that this difference constituted the inducement on the part of the Trust Company to enter into the arrangement. I deem the conclusion inevitable, therefore, that the transaction was usurious. It follows that the complainant is entitled to some portion at least of the relief which he asks; unless he is precluded upon the grounds assumed on the part of the appellants.
It is urged by the appellants' counsel, that it appears from the bill itself that the complainant was a participator in violating the banking laws of the state; and that while the facts alleged might constitute a good defence, were the Trust Company seeking to enforce the payment of his bond, the court will not grant affirmative relief to one who shows himself to have been concerned in an illegal transaction.
There is no rule better established than that which refuses the active interposition of a court of equity in favor of one who isparticeps criminis; but like most other rules it admits of exceptions. There are certain cases where the party seeking relief, although particeps criminis, is not in pari delicto,
to which it does not apply. This distinction seems to have been first taken by Lord Mansfield, in the case of Smith v.Bromley (2 Doug., 696, note to Jones v. Barkley). The exception was there applied only to cases where the law violated was intended to protect one of the parties from particular acts
of oppression or extortion by the other; as for instance the statute against usury. Subsequent cases however, show that the principle is not *Page 124 
confined to that class of cases. The next case in which the question arose, was that of Jacques v. Golightly (2 Wm.Bl., 1073). The plaintiff had paid to the defendant money as a premium for insuring lottery tickets, a transaction prohibited by statute, and the action was brought to recover it back. It was insisted for the defendant, that the plaintiff being particepscriminis, could not recover. But the action was sustained. Blackstone, J., said it was not like the stockjobbing act; "because there both parties are made criminal, and subject topenalties." Browning v. Morris (Cowp., 790), was another case of the same kind. Lord Mansfield there draws the distinction between acts which are mala in se, such as bribery, and those which are merely prohibited by statute; and in the course of his opinion remarks that, "it is very material that the statute itself by the distinction it makes has marked the criminal; for the penalties are all on one side; upon the office keeper." A similar question afterwards arose in the case of Williams v.Hedley (8 East, 378), where it was very elaborately examined by Lord Ellenborough, who confirmed the doctrine of the previous cases. The principle of these cases is so obviously just, that no argument seems necessary to sustain it. To say that in every transaction prohibited by positive enactment, the parties concerned are necessarily in pari delicto, would in many cases be manifestly absurd; and the test adopted by Lord Mansfield and Mr. Justice Blackstone, by which to determine the relative guilt of the parties, viz., to see upon which party the penalty is imposed, would seem to be just.
These cases have been several times reviewed and approved by the supreme court of Massachusetts. In the case of Inhabitantsof Worcester v. Eaton (11 Mass. R., 368), Ch. J. Parker after referring to the cases of Smith v. Bromley andBrowning v. Morris, supra, says: "This distinction seems to have ever been afterwards observed in the English courts, and being founded in sound principle, is worthy of *Page 125 
adoption as a principle of common law in this country." The same question afterwards arose in the same court, in White v. TheFranklin Bank (22 Pick., 181), and was there very fully discussed. The suit was brought to recover money which the plaintiff had deposited with the defendant, under an agreement that it should remain for a certain specific time, in violation of an express statutory provision, which prohibited the bank from making contracts "for the payment of money at a future day certain." The action was held to lie, and the principle of the English cases to which I have referred was emphatically sustained by the unanimous opinion of the court. (Lowell v. Boston Lowell R.R. Co., 23 Pick., 24; Atlas Bank v. Nahant Bank,
3 Met., 581.)
It was said upon the argument, that the modern cases are opposed to this doctrine; but I am very firmly persuaded that the doctrine is sound and the distinction upon which it rests one which exists in principle and in reason. It applies no less in equity than at law, its foundation being that the parties, although joint participators in an illegal transaction, are notequally criminal. In the present case the penalty for violating the statute is imposed upon the Trust Company alone.
It is unnecessary, however, to decide what would be the rights of the complainant were he seeking some kind of relief on the ground of a violation by the Trust Company of the restraining law. The question is, whether he is precluded from all relief against the usury, because the usurious contract was connected with a transaction which was within the prohibition of the restraining act. I see no just ground for thus holding. The usury and the violation of the restraining law are entirely distinct offences. The statutes are distinct and the penalties distinct. The one offence depends upon circumstances having no necessary connection with those which establish the other. The complainant in the eye of the law is one whom the statute of *Page 126 
usury was designed especially to protect; and why should he be deprived of this protection because, in connection with the usury, there was another violation of law? If instead of an act entirely innocent in itself, and only wrong because prohibited on grounds of public policy, the complainant had participated in the commission of an offence malum in se, involving deep moral turpitude, there might seem to be a moral if not legal propriety in depriving him of the remedies which the law affords by way of penalty for his crime. The case of usury being an admitted exception upon principle to the rule which denies relief to one who is particeps criminis, I do not see how it is brought within that rule by being connected with another offence involving on the part of the complainant, at least, no greater degree of moral guilt. No authority other than those which establish the general rule was cited for the position, and I think none can be found to sustain it. This rule, therefore, affords in my view no obstacle to the relief sought by the bill.
To what relief then is the complainant entitled? This depends in some measure upon the question whether he is to be regarded as a borrower within the provision of § 4 of the act of 1837, which provides, "that any borrower of money, goods or things in action," may file a bill for relief against usury, without offering to pay any part of the sum loaned; and that the payment of the whole or any part of such sum shall not be required as a condition of granting the relief. If Schermerhorn, under the proof in the case, is not entitled to relief as a borrower within the meaning of this provision, then, according to the settled principles of equity, he must "do equity" before the court will interpose in his behalf. The supreme court held that Schermerhorn was to be regarded as a borrower notwithstanding the bankruptcy, on the ground that the word borrower in the statute is intended as descriptio persona, and that the complainant comes within that description. Judge Marvin, who delivered the opinion of the court, on this subject, says: *Page 127 
"The plaintiff is certainly within the letter of the statute." It describes him. He was the "borrower." This is no doubt true. But is it not necessary, in order to give him the benefit of the provision, that he should be entitled to relief, in his character of borrower? Is not the true question, whether he comes into court as the borrower, whether he represents the title and interest which the statute was designed to protect, and whether, if relieved at all, he is to be relieved as the borrower, or as the purchaser at the sale in bankruptcy?
In the cases of Post v. The Bank of Utica (7 Hill, 391) and Rexford v. Widger (2 Comst., 131), it was held, that the term borrower did not include purchasers from the borrower. What is the complainant here but a purchaser? It is said that he had never parted with his entire interest; that he would have been entitled to an account from the assignee; and that if his debts had been discharged without a resort to this property, it would have revested in him. But the answer is, that by the sale, every vestige of his original interest was cut off. He acquired by the purchase the same rights that would have been acquired by a stranger, and none other. It is by virtue of the title acquired, at the sale alone, that he comes into court, and the circumstance that he is the same person who was once entitled to relief as a borrower is a mere accident, which cannot affect his rights. He can claim the same relief to which the assignee in bankruptcy, or any other purchaser under him, would be entitled. If he asks equity, therefore, he must do what equity requires.
But it is insisted on the part of the complainant, that the post notes issued by the Trust Company are void; that the company is not liable for their payment; and hence, that equity does not require any provisions to be inserted in the judgment for its benefit or protection. Whether these notes are void or not is a question between the Trust Company and the holders. It has never yet been decided in this state, *Page 128 
so far as I am aware, that a banking company can set up its own violations of law as a defence against its negotiable promissory notes, in the hands of a bona fide holder for value; and that decision will hardly be made for the first time, upon a collateral presentation of the question, in a case to which the holders of the notes are not parties.
What then does equity require in this case? Plainly, that the bond of Schermerhorn should be canceled, and that he should be put in possession of the property purchased of the Holland Land Company, and its proceeds, upon payment of the sum actually borrowed of the Trust Company, with interest to this time. In ascertaining that sum, we are not to be governed either by the amount which the complainant and his associates received for the certificates, or by their market value at the time of the loan, but exclusively by the amount of the obligation which the Trust Company assumed upon the face of the certificates; in other words, the amount which the company must pay to redeem them. The relief granted to Schermerhorn, therefore, should be upon condition that he pay the principal sum loaned, estimating the pound sterling at its value in London where the certificates are payable, and interest upon that sum to the time of payment; with a rebate, however, of the difference in interest of two per cent for the whole time the certificates have from their dates to run.
It was insisted orally upon the argument, that the effect of declaring the contract between the complainant and his associates and the Trust Company usurious would be to render void not only the bond of the complainant, but every other part of the transaction, including the deed of the Holland Land Company to the trustees; thus leaving the title to the land and other property in question in the last mentioned company. But Chancellor Walworth in his printed argument concedes that this consequence would not necessarily follow unless relief is granted to the complainant as a borrower under the act of 1837. He says: *Page 129 
"The case is different where the complainant comes into court to do equity. By making such an offer he waives the forfeiture; and the court in such a case instead of setting aside the transaction is authorized to confirm it, so far as is necessary to do equity between the parties; and to mould and regulate the interests of all parties therein, so as to do perfect equity. In such a case the court confirms such parts of the transaction as ought to be confirmed, and sets aside or corrects such parts thereof as ought to be corrected."
This is a clear and accurate statement of the rule, except that the power of the court so to arrange the different parts of the entire transaction as to accomplish what equity demands, is not confined, I apprehend, to cases where the complainant offers in his bill to do equity, but exists in every case in which the court is called upon to adjust the rights of the respective parties upon purely equitable principles. Formerly when bills of this character were filed to obtain a discovery as well as relief, unless the complainant offered in his bill to do what equity would require, upon the facts alleged in the bill itself, the defendant might demur; not because the court could not, if the facts were esstablished, grant the relief to which the complainant was equitably entitled, but because a discovery would not be compelled without such offer. If, however, the defendant voluntarily answered instead of demurring, and the allegations in the bill were proved, the books are full of cases in which relief was granted upon such terms as to the court seemed just. (Livingston v. Harris, 3 Paige, 528; Fanning v. Dunham,
5 John. Ch. R., 122.)
In this case, there can be no difficulty in adjusting the equities of the parties, because no part of the transaction need be avoided except the bond of Schermerhorn. The deed of the Holland Land Company and the partition among the associates should be confirmed; and the trust in favor *Page 130 
of the Trust Company should be permitted to stand until the actual indebtedness of Schermerhorn to the company is paid.
It should be referred to a referee to compute the amount due to the Trust Company upon the principles here indicated, and to take and state an account between the trustees, the Trust Company, and the complainant, mutually and respectively; and the judgment should provide that the complainant pay the balance, if any, which may be found due to the Trust Company, with interest; that the proceeds of the trust property continue to be applied to the payment of such balance until the same shall be fully paid; and that upon payment thereof in full, either by the complainant or by the trustees from the proceeds of the trust property, the complainant shall be entitled to a conveyance and assignment from the trustees of all the trust property remaining in their hands or under their control, or in the hands or under the control of their agent or agents. The judgment of the supreme court must be modified accordingly, and the proceedings must be remitted to that court with instructions to carry out the principles herein set forth. No costs are to be allowed to either party in this or in the supreme court.