John G. Bishop, Plaintiff, *v.* Fremont Rider and Another, Defendants.*

County Court, Rockland County, December 31, 1930.

*Wallace B. Lydecker*, for the plaintiff.

*Natalie F. Condi*, for the defendants.

PATTERSON, J. The plaintiff brings this action to foreclose a mortgage on property in Rockland county.

The defendants plead the defense of usury.

The facts, or so much thereof as are germane to the issue, are as follows:

In August, 1928, the defendant Fremont S. Rider applied to the plaintiff for a loan of $5,000. What led up to the necessity for this loan will perhaps prove helpful.

In 1926 the Nova Corporation, of which Mr. Rider at that time owned ninety per cent of the stock, was the owner of a tract of land in Florida, the actual investment in which was $32,800. Mr. Rider needed $5,000 in cash, and applied to Mr. Bishop for a loan of that amount on Rider's note, and that he (Rider) would give Bishop a bonus of fifty per cent of the loan in the common stock of the Nova Corporation.

---

* Affd. on opinion below, 235 App. Div. 736.

The alternative proposition was that Mr. Bishop should buy fifty shares of Mr. Rider's preferred stock in the corporation, receiving the usual bonus of the common stock that a sale of the preferred stock carried.

It was this second proposition that Mr. Bishop accepted, and thereupon received both the preferred and common stock, and Mr. Rider in return received therefor from Mr. Bishop $5,000. Mr. Bishop was thereupon elected a director of the Nova Corporation.

Some time prior to November, 1927, the Florida boom in real estate collapsed. About this time Mr. Rider learned that the Vanderbilt home, " Oakdale " on Great South bay, Long Island, which was owned by the Vanderbilt Park, Inc., was for sale and could be bought for $200,000. He then arranged, through the medium of the " Nova Corporation," to exchange the Florida property for the Vanderbilt property upon the following terms: The Vanderbilt Park, Inc., would convey its holdings to the new corporation, which was to be formed by Mr. Rider and his associates, to be known as the " Oakdale Club of Long Island, Inc.," of which Mr. Bishop likewise became a director, for $200,000, to be paid first by a conveyance from the Nova Corporation to Vanderbilt Park, Inc., of the Florida property at a price fixed at $75,000, cash of $25,000 and the balance of $100,000 by a purchase-money mortgage on the property. This purchase was consummated. The holders of the preferred stock of the Nova Corporation made up the cash payment of $25,000 and Mr. Bishop's share or contribution was $3,400, which he paid in cash.

This left the Nova Corporation without any tangible assets. It was merely a holding corporation for the Oakdale Club of Long Island, Inc., and hence the value of its stock was just what was the value of the Oakdale Club of Long Island stock. It subsequently proved to be quite worthless, or nearly so.

The Oakdale Club was not a success. Mr. Rider, in August, 1928, found that he needed money to tide him over, either for the use of the Oakdale Club or personally, as a result of the drain which the demands of the Oakdale Club had made upon his personal resources, and he thereupon applied to Bishop for a $5,000 loan for which the mortgage in suit was given to secure.

There is some testimony that Mr. Rider wanted the loan for the club, but in any event Mr. Bishop consented to make the loan, but to Mr. Rider personally and on condition, first, that the defendant Rider buy back Mr. Bishop's stock in the Nova Corporation for which he had paid $5,000, and also reimburse him for the $3,400 which had been assessed against his holdings in that corporation,

and he thereupon agreed to make the loan of $5,000, providing that the defendant Grace G. Rider would give him a mortgage on her home in Rockland county in the amount of $13,400, which was made up of $5,000, cash advanced, and $8,400 which Bishop had invested in the Nova Corporation. The mortgage in question was thereupon given to Mr. Bishop for $13,400, and Mr. Rider received checks from Mr. Bishop totaling $5,000.

That is all that he actually received, it being conceded that at no time did Mr. Rider receive either the stock of the Nova Corporation or that of the Oakdale Club of Long Island, Inc., which . Mr. Bishop claims he, Rider, agreed to purchase.

As to this agreement being usurious depends, not so much on whether the stock of the Nova Corporation was worth what Mr. Rider had agreed to pay for it, but rather, was there an actual and honest sale of it to Mr. Rider at all, or was it a mere subterfuge to cover up a usurious agreement. Did Mr. Bishop exact from Mr. Rider that he, Rider, should make him whole for what was then his most apparent loss of his investment in the Nova Corporation? Did Rider receive any *quid pro quo* for the $8,400 which he obligated himself to pay to Bishop? Was the stock of any value to Rider? Did it have any value at the time?

I think the testimony, the examination of the financial conditions of the Oakdale Club at the time the loan was made, the subsequent eventualities, the early collapse of the entire Oakdale undertaking, forces one to the conclusion that it had practically no value.

It must be borne in mind that Bishop was a director of the Nova Corporation and the Oakdale Corporation; he attended the directors' meetings; he was in constant communication with Rider as to the affairs of the Oakdale venture. He knew of Rider's pressing need for funds, and he, as well as Rider, knew that at the time the loan was made the Nova Corporation, or its child, the Oakdale Club of Long Island, Inc., was moribund. It is true the exchange value of the Florida property was placed at $75,000, but all experience in such matters tells us that this means little or nothing as to real value. The figure was undoubtedly arbitrary and fixed to balance values as between the two properties. It would be unique to learn in any exchange of real estate that the object of each party was not to boost the value of his own to as high a point as possible.

The value of the Nova Corporation stock must be measured as of August, 1928. At that time it is extremely doubtful if any one could have sold a share for a fraction of its par value, and yet Bishop would have us believe that Rider agreed to buy his for, not only par, but $3,400 in excess thereof.

It cannot be easily conceived that Rider, who better than any one else knew of its sore financial straits, would have willingly contracted to purchase its stock at a figure in excess of its par value.

Such a transaction is devoid of every earmark of the hope of possible profit on the part of Rider.

The plaintiff claims that he was to receive stock in the Oakdale Club when it was formed. There is nothing to substantiate this. The corporation minutes clearly show everything to the contrary. The minutes of the stockholders' meeting of April 3, 1928, show that, in payment of the Florida holdings, the Nova Corporation had received stock in the Oakdale Club of Long Island, Inc., of the par value of $100,000. The Nova stock was the only stock ever issued or owned by Mr. Bishop. At least, it does not appear that he made any demand upon any one for the Oakdale stock, and to have done so would have been a mere idle gesture. If the agreement was that Mr. Rider was to receive stock in the Oakdale Club, then in the natural course he would have surrendered his Nova Corporation certificates to the Oakdale Club. The fact that he did not show that he never expected stock in the Oakdale Club, and if he had expected its stock, the fact that he did not turn in his Nova stock would lead to the conclusion that he did not think the Oakdale stock of much or any value. I am afraid that Mr. Bishop's contention that he was to have received stock of the Oakdale Club was a creature of his imagination. Mr. Bishop admitted that he would not loan the $5,000 to Mr. Rider unless he, Rider, would take over Bishop's interest in the Nova Corporation, and this was a condition precedent for his advancing any money.

The defendants argue that even that agreement was never consummated, because he never delivered the Nova Corporation stock or any assignment of his interest therein to Mr. Rider until in the course of the trial the court raised the question of the necessity of a tender of delivery when he then, for the first time, tendered the stock to Mr. Rider, which was refused. Plaintiff contends that title to the stock passed by the verbal agreement to purchase, made between Rider and Bishop, and that when the mortgage was given the contract was concluded, delivery not being essential to pass title to stock, and cites several cases to support this contention, all of which relate to the sale of personal property other than stock. Section 162 of the Personal Property Law provides that title to stock can pass only by delivery of the certificates or by a written assignment thereof."

Concededly this was not done. It would seem that if the plaintiff had considered the stock of any value he would have delivered

it to Mr. Rider. His failure so to do would seem to be some evidence of his knowledge that the stock was valueless, and also that there was no intention of even going through the formality of delivery and transfer of title, as a purely futile move. Then too, as bearing upon the value of the stock if it had any substantial value, would not Rider have demanded delivery of it from Bishop if he had in fact paid $8,400 therefor? Certainly the agreement to sell the stock on the part of Bishop, and that on the part of Rider to buy, seems to have commenced and ended with the agreement. There was not the slightest move made on the part of either to consummate it; the first, by the tender of delivery, or putting himself in the position to deliver, and on the part of the second, by demanding delivery of the stock. This exhibits a rather unusual degree of nonchalance towards property for which $8,400 had been paid.

I am not so very sure that tender of delivery on the part of Bishop was necessary. It is important, however, as bearing upon what the parties considered the value of the stock. The loan may still be usurious even though delivery was not necessary to transfer title thereto.

Usury as defined by our statute (Gen. Business Law, § 371) is comprehensive and the penalty therefor is harsh. "No person or corporation shall, *directly* or *indirectly*, take or receive in money, goods or things in action, or in any other way, any greater sum or greater value, for the loan or forbearance of any money, goods or things in action, than is above prescribed."

Wherever you find usury, you will find a subterfuge of one kind or another. Circumvention is usually resorted to to give the color of legality. Usury and ingenuousness are never found cheek by jowl. It does not consist merely in a greater interest than six per cent payable in cash, but it is also usury when, as an inducement for a loan, a sale has been forced at some amount more than the actual value of the thing transferred.

Even if the " Nova " stock at the time of the loan was worth its par value of $5,000, what Bishop paid for it, it was not, by any possible stretch of the imagination, worth the $3,400 in addition, and, hence, it may be held that the transaction was usurious.

Whether a transaction is a usurious one depends upon the intention of the parties, and that is a question for the jury (here for the court). (*Thurston* v. *Cornell*, 38 N. Y. 281.)

In an issue of usury it is the duty of the court to examine the substance of the transaction and ascertain the parties' intent, independent of its form. (*Hall* v. *Eagle Insurance Co.*, 151 App. Div. 815; affd., 211 N. Y. 507.)

" The transaction must be judged by its real character, rather

than by the form and color which the parties have seen fit to give it." (*Quackenbos* v. *Sayer*, 62 N. Y. 344).

The scheme or subterfuge here resorted to is not novel, and when challenged or brought into the open has always received the disapprobation of our courts.

The authority of *Eagleson* v. *Shotwell* (1 Johns. Ch. 536) is pretty ancient law, but it is still good law unless the statute against usury has nullified or modified that authority, which it has not.

That case is interesting because it is about as analogous as a case may well be. There the borrower applied for a loan of $2,000 on a bond and mortgage, the defendant agreeing to loan the same, providing the plaintiff's husband would also purchase four shares of stock of an insurance company at par or $250 per share, when as a matter of fact the stock was only worth $125. The bond was conditioned to pay $3,000, and a mortgage for that amount was given on the premises for security. The defendant advanced $2,000 and transferred the four shares of stock and delivered the same to the plaintiff's husband. The defendant was one of the directors of the insurance company at the time of the loan and sale of the stock. The court held that the sale of the stock was a mere color for a usurious loan, and the defendant took advantage of the necessity and weakness of the plaintiff's husband and the contract and loan was held to be usurious. The coincidence is striking. (See, also, *Seymour* v. *Strong*, 4 Hill, 255; *Schermerhorn* v. *Talman*, 14 N. Y. 93, 115; *Knickerbocker Life Insurance Co.* v. *Nelson*, 78 id. 137; *Carnegie Trust Co.* v. *Chapman*, 153 App. Div. 783; *Birdsall* v. *Patterson*, 51 N. Y. 43.)

As was said in *Schermerhorn* v. *Talman* (*supra*): " It is the theory of the laws against usury that the borrower is under a species of moral duress, and hence his consent and co-operation in the illegal transaction does not prejudice him."

My conclusion from the evidence before me is that the transaction as to the sale of the stock cannot be considered as a *bona fide* sale, but merely as a part of a scheme to bolster up a usurious loan.

While my conclusion of law, based upon my finding of fact, may possibly not receive appellate approval, the court has no doubt, after hearing and seeing the witnesses, that the loan was tainted with usury; that Bishop took advantage of Rider's pressing necessities to get rid of practically worthless stock for more than its par value; he exacted and demanded that the defendant make him whole on a previous stock transaction as a condition for making the loan, and that while Rider received but $5,000 in cash, he obligated himself to the extent of $13,400, there being little, if any, consideration for the difference.

I realize the result of this decision is harsh to Bishop, but the penalty for usurious loans has ever been harsh to the lender.

The court would prefer to make a decree that the mortgage be a lien on the property to the extent of the money actually received by Rider, namely, $5,000, and as to the balance that it be declared void. However, section 373 of the General Business Law provides, in the case of a usurious loan: " All bonds,  *  *  *  conveyances, *  *  *  whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forebearance of any money, goods or other things in action, than is above prescribed, shall be void."

In view of the finding here made, that the loan was usurious, the court, it would seem, must order judgment that the complaint be dismissed and the bond and mortgage adjudged and decreed usurious and void, and that the plaintiff may be decreed and compelled to deliver up said bond and mortgage to be canceled and discharged of record.