## DANIEL DeSIMON et al., Appellants, v OGDEN ASSOCIATES, Respondent.

Second Department, September 7, 1982

### APPEARANCES OF COUNSEL

*Patrick J. Rohan* for appellants.

*Gallet & Dreyer (Jeffry H. Gallet* of counsel), for respondent.

### OPINION OF THE COURT

O'CONNOR, J.

The question for decision is whether seller-sponsor financing of the purchase of shares in a co-operative housing corporation by the tenants of the apartment building undergoing conversion is a loan subject to the prohibition and forfeiture provisions of the usury laws. We hold that it is not.

### FACTS

Defendant Ogden Associates, a partnership, sponsored a co-operative housing conversion plan under sections 352-e and 352-eee of the General Business Law for a residential property it owned in Bronxville, Westchester County. It had formed a corporation for that purpose in October, 1978, with which it contracted to convey the property; under the

plan, defendant (hereinafter the sponsor) intended to surrender control of the corporation to shareholding tenants upon sufficient subscription to its offering.

Following settlement negotiations on October 24, 1979 between the sponsor's counsel and counsel for the tenants' association, the former drafted a "memorandum agreement," dated October 29, 1979, under which the plan would be amended, *inter alia,* to require the owner as "seller-sponsor" under the plan partially to finance the subscription price from a fund it would establish in the amount of $85,000. Occupying tenants twice refused bank financing were to be given the right to draw from this fund on a first-come, first-serve basis, and to execute negotiable notes secured by pledges (blank assignments) of their shares and proprietary leases to the sponsor under Uniform Commercial Code security agreements. The memorandum agreement described the financing arrangement as "purchase money loans" and specified that they would bear interest at the same rate and carry "the same administrative and closing charges paid on CITIBANK co-op loans" on the closing date. In return, the tenants waived any objections to the conversion plan and offering then pending before the Department of Law of the State of New York, and agreed to purchase their apartments under the plan upon approval by the department and "to perform or cause to be performed those items contained in this agreement."

The plan, as thus amended, was accepted for filing by the department on November 27, 1979, and plaintiffs were among the first group of tenants to draw upon the sponsor's financing fund. With this loan commitment they executed subscription agreements in November, 1979.

Despite the settlement, however, problems arose when the sponsor announced that it was permitting a draw-down by one tenant not represented by counsel for the tenant association, who allegedly was a nonoccupant and a business associate of defendant's principal. The sponsor also announced what the plaintiffs (hereinafter also the tenants) considered to be an improper offset of certain closing adjustments against a reserve fund established under the memorandum agreement.

By letter dated January 4, 1980, counsel for the tenants urged the sponsor's counsel to arrange for early closings for his clients, and in response the latter fixed the closings for January 17, 1980, enclosed blank copies of the documents to be executed at the closings by the tenants, and reiterated the memorandum agreement's provision that the interest rate on the loans would be at the same rate charged by Citibank on Citibank co-operative housing loans on that date, plus an origination fee equal to Citibank's because Citibank "also charges an origination fee". On the day of the closings the sponsor's counsel telephoned Citibank's mortgage department and ascertained that its interest rate for such loans that day was 13.5%, plus a 2% origination fee.

As scheduled, the closings took place on January 17, 1980, in the evening, with each of the plaintiff tenants executing an installment note and a loan security agreement, the latter waiving all of the tenant's defenses not arising out of the security agreement itself. The next day the tenants commenced this action by service of a summons and verified complaint along with an order to show cause seeking a preliminary injunction enjoining the sponsor from negotiating or transferring the notes. The complaint prayed for a judgment declaring the loans usurious and void and for a direction that the sponsor cancel and surrender to the tenants their notes, share certificates, proprietary leases and Uniform Commercial Code security documents. Neither the complaint nor any other document in the record reflects a desire on the tenants' part for rescission of their subscriptions.

In the complaint the tenants alleged — on information and belief — that the interest rate and origination fee were each a point higher than Citibank charges, and that the fee was nothing more than disguised interest because the sponsor had not incurred any costs warranting such a fee; accordingly, the effective interest rate was 15% and usurious. The complaint further alleged that the sponsor was a private lender outside the protection of recent Federal usury law moratorium acts and that its "loans" could not avoid characterization as usurious on the ground they were

purchase-money loans because the seller of plaintiffs' shares was the corporation, not the sponsor.

In addressing the tenants' motion for a preliminary injunction, the sponsor's counsel accused opposing counsel and the tenants of "egregious behavior" and "malevolence" in concocting this scheme to acquire their apartments "for free", and argued that the equitable doctrine of unclean hands barred any injunctive relief and that the tenants had made no tender of the property thus acquired under the parties' agreement, which involved purchase-money loans outside the ambit of the usury laws. Special Term (RUBENFELD, J.), by order entered March 11, 1980, denied the motion for failure by the tenants to show usury clearly "upon full consideration of all of the facts"; the court ruled that the notes may be viewed by the court as purchase-money instruments in the sale of property rather than evidence of loans. Furthermore, the court held that in the absence of a clear showing of usury it would not grant equitable relief in the face of a question of the tenants' good faith in bringing this action the day after executing the notes.

The sponsor served an answer and counterclaim. It denied that the interest and origination fee were usurious and emphasized that the notes were purchase-money instruments. The sponsor took the position that the parties' agreement intended that the money paid by the tenants at the closings, and in the future on the notes, be paid over to the sponsor by the corporation as the corporation's consideration under the sponsor's contract to sell the property to the corporation.[1] Alleging fraud and mutual mistake, the sponsor alternatively sought damages for breach of the agreement and dishonor of the notes, rescission of the agreement, or a declaration to the effect that the agreement and documents were void as to the tenants and that

---

1. "The essence of the transaction was that the plaintiffs borrowed money from Ogden to purchase shares in the Apartment Corporation so that the Apartment Corporation could then pay that money to Ogden in exchange for the building. Until the completion of this transaction, the Apartment Corporation [controlled by Ogden] was no more than a conduit of funds from the purchasers of apartments to Ogden * * * Ogden is not an arm's length dealer but, rather, the seller."

the shares and proprietary leases now belong to it free and clear of any claims or liens of the plaintiff tenants.

Along with its answer, the sponsor served a notice of motion for summary judgment. The sponsor's counsel attributed the "structur[ing]" of the memorandum agreement's amendment to the conversion plan to the tenants' counsel, who made no changes and raised no objections to his draft of their understanding. It was the sponsor's position that the tenants' counsel had wanted the interest and service charges to be that scheduled by banking institutions while knowing full well that at the time of closing such rate would exceed 12%.

The tenants' reply, verified by plaintiff Daniel DeSimon, denied the sponsor's specific averment that the tenants' counsel had demanded use of Citibank's schedule, and the tenants' counsel, in an affirmation, averred that the sponsor's response to his financing demand had been the use of Citibank rates including ancillary closing costs. The affirmation did not, however, deny that the use of bank rates — as distinguished from Citibank rates — originated with him during the October 24, 1979 meeting, and plaintiff Richard Roessle, in an affidavit and at his examination before trial, admitted that his counsel's opening position was for "[s]ponsor financing on normal bank terms for co-op loans," to which sponsor's counsel had "insisted" on Citibank terms. Daniel DeSimon admitted in his examination before trial that on January 17, 1980, shortly before he closed, his counsel had told him that the loan might be usurious, that there might be a lawsuit, and that he should meet with him the next morning, at which time the tenant signed the affidavit in support of the order to show cause and verified the complaint. At the closing, counsel had told him: "Just buy your apartment, and we will deal with it." The tenants' counsel, in his affirmation, admitted advising his clients that night that the notes might be usurious, but he said the lawsuit was caused by the postsettlement conduct of the sponsor and its counsel. Had it not been for the "illegal and obnoxious" acts of the sponsor and its counsel, he would have advised the tenants against

bringing an action despite what he called the existence of usury "as a matter of law."[2]

Special Term (DICKINSON, J.), granted the sponsor's motion for summary judgment and dismissed the complaint. The court ruled that the parties' agreement had clearly been one involving purchase-money loans not subject to the usury laws, and that the tenants had failed to overcome the clear language of the memorandum agreement ("purchase money loans"). The court also noted that the sponsor's invocation of the unclean hands doctrine was "compelling" in view of the tenants' commencing the action the day after closing and after they had been advised by their counsel that the loans were usurious.

### THE LAW

Although the usury statute in issue (General Obligations Law, § 5-511, subd 1) speaks of "money, goods or other things in action," a necessary element of the tenants' statutory cause of action in usury is the existence of a loan of money (see *Weaver Hardware Co. v Solomovitz,* 235 NY 321, 331; *Meaker v Fiero,* 145 NY 165, 170; *Schermerhorn v Talman,* 14 NY 93, 115-116; *Dry Dock Bank v American Life Ins. & Trust Co.,* 3 NY 344, 355; *Van Dyk v Dujardin,* 213 App Div 791, 795; *Thomas v Knickerbocker Operating Co.,* 202 Misc 286, 287; 6A Corbin, Contracts, § 1500, p 682). The distinction between a loan of money and its economic equivalent, an extension of credit, has always been as crucial to the determination of the applicability of the usury laws as it has been difficult to ascertain in any given transaction; however, the unarticulated reason for making the distinction appears to be based upon the degree to which the creditor *controlled* the debtor's use of the money loaned or credit extended. There are two types of transactions in which the courts on such a basis avoid the total forfeiture provisions of the usury laws: time-price sales and subrogations to valid pre-existing creditors' claims.

---

**2.** In his examination before trial, Roessle stated that his counsel had told him after closing of the possibility of a lawsuit on the ground of usury, but added that he had not authorized any action and did not know about the instant action until plaintiff Daniel DeSimon informed him of it after it had been commenced.

The first exception requires the finding of a sale on credit. A sale is generally defined as an absolute or conditional transfer, or contract to transfer, property — including title (see 67 Am Jur 2d, Sales, § 6, p 119). Credit, however, is less susceptible of definition.

An initial conceptual problem arises from the very nature of a loan in common-law property terms because familiar commercial schemes (e.g., Uniform Commercial Code, §§ 9-107, 9-312 [purchase-money security interests]; Personal Property Law, arts 9, 10 ["Motor Vehicle Retail Instalment Sales Act" and "Retail Instalment Sales Act", respectively]; Consumer Credit Protection Act, US Code, tit 15, §§ 1601, 1602, subds [e]-[h]; § 1605, subd [a], par [1]; Uniform Consumer Credit Code [1974], 7 ULA, Business and Financial Laws, § 1.301, subds [12], [15]) function without attaching any legal significance — crucial to usury laws — to whether the financing of a transaction is through loans of money or extensions of credit. This practical approach simplifies the early common law's struggle to analyze loans in terms of bailment or sale. For example, if Kent and Jones rather than Blackstone and Storey are followed (see 8 Am Jur 2d, Bailments, § 3, p 739), a sale is distinguished from a bailment by limiting the latter to contracts for the use and return of property in the same or altered form (i.e., *in specie*) during which period title never leaves the creditor. Hence, if by such contract the recipient of the property was entitled to return a different thing equivalent in value (i.e., *in genere,* such as currency in different denominations), then title had passed and the recipient returning the property would technically be regarded as a buyer rather than a borrower (see *Sattler v Hallock,* 160 NY 291, 298-300; *Foster v Pettibone,* 7 NY 433; 67 Am Jur 2d, Sales, § 33, p 142). A loan of money, being regarded as neither wholly bailment nor sale, was analyzed in terms of the Roman law concept of *mutuum,* a loan of property for consumption to be returned *in genere,* constituting a sum certain enforceable by action in debt, but not specifically performable because the property to be returned was not *in specie* (see *Elwell v Chamberlin,* 31 NY 611, 615; *Cummings v Williams,* 4 Wend 679, 681-682; *Carpenter v Griffin,* 9 Paige Ch 310, 313; 8 Am Jur 2d,

Bailments, §§ 48, 49, pp 787-788; 2 Pollock and Maitland, History of English Law [2d ed], pp 206-207; 2 Blackstone's Comm [Dawsons ed], 464; but see *Robinson v Bland,* 2 Burr 1077, 1086 [KB 1760], discussed in 1 Clark, New York Law of Damages, § 197, p 333; Fry, Specific Performance [5th ed], §§ 16, 38; 1 Sedgwick, Damages [9th ed], § 4). An action in debt, however, was the form of action for recovery on both a loan of money and a sale of goods (see *Brigham v McCabe,* 20 NY2d 525, 529-530; Holmes, The Common Law [1963 ed], lect vii, pp 199-201; Maitland, The Forms of Action at Common Law, lect v, p 52). Therefore the existence of indebtedness alone arising under a transaction governed by common law or modern statutes is of little use in resolving the question of whether the transaction involves a loan of money.

If the parties' transaction involves property in addition to money, the courts look to the parties' intentions as "gathered from the situation of the parties and all the facts and circumstances of the case" to see if the transaction is a sale or a secured loan (*Schermerhorn v Talman,* 14 NY 93, 116, *supra;* see *Meaker v Fiero,* 145 NY 165, 169-170, *supra; Quackenbos v Sayer,* 62 NY 344). The usury laws do not empower the courts to intervene in the result reached by a creditor and debtor after negotiating the value of the creditor's consideration supporting the debtor's promise to pay money. As was stated in *Del Rubio v Duchesne* (284 App Div 89, 90): "It is not legally objectionable for a man to pay too much for property; and it is not objectionable when he does pay too much to give the excessive consideration in the form of a mortgage rather than in cash. This may be hard dealing but it is not usury." (Accord *Spencer v Tilden,* 5 Cow 144, 148.) A seller's extension of credit by demanding a premium (a time-price differential) in the amount representing the difference between a cash and credit price is not considered to be a loan of money for usury purposes. This was the rule laid down in 1850 by the Court of Appeals in *Brooks v Avery* (4 NY 225, 229), and with one aberrational decision (*Universal Credit Co. v Lowell,* 166 Misc 15), it has been uniformly applied ever since (*Thomas v Knickerbocker Operating Co.,* 202 Misc 286, 289, *supra; Levine v Nolan Motors,* 169 Misc 1025, 1026-1027; see, e.g.,

*Credit Alliance Corp. v Crump Sand & Fill Co.,* 470 F Supp 489 [applying New York law]; *Zachary v Macy & Co.,* 31 NY2d 443, 457; *Stitz v Stevens,* 70 AD2d 588, affd 48 NY2d 957; *Johnstown Bank v American Sur. Co. of N. Y.,* 6 AD2d 4, 7; *Butts v Samuel,* 5 AD2d 1008; 14 Williston, Contracts [3d ed], § 1688A, pp 737-740). Since it is an intention to sell property rather than to lend money that governs the characterization of any given transaction, a time-price characterization is not necessarily precluded by the seller's explicit statement of a charge to cover the cost of financing the sale (*Archer Motor Co. v Relin,* 255 App Div 333; *Thomas v Knickerbocker Operating Co., supra*), or by his checking the buyer's credit and using a promissory note (*Congress Fin. Corp. v Patti,* 26 AD2d 924), or even by his discounting the note to a third party for purposes of financing the sale pursuant to the sales contract and as a condition of such sale (*Brooks v Avery, supra*). Thus, in determining whether the court is being asked to help a "lender of money to obtain a premium on a loan rather than the expression of a better price on a sale" (see *Del Rubio v Duchesne,* 284 App Div 89, 90, *supra;* see, also, *Weaver Hardware Co. v Solomovitz,* 235 NY 321, 331, *supra;* 14 Williston, Contracts [3d ed], § 1683A, p 719), the court must ascertain whether the sale would have occurred in the absence of the seller's financing agreement (see *Morris Plan Ind. Bank of Schenectady v Faulds,* 269 App Div 238, 242).

On the other hand, if the parties' transaction involves refinancing of a legitimate pre-existing debt (whether incurred by a sale or loan transaction), the equitable doctrine of subrogation is invoked by the courts as the second exception to the usury laws' forfeiture provisions. The refinancing is characterized as a loan of money subject to the usury laws, but the creditor/lender is subrogated to the rights of the prior creditor upon discharge of the prior debt so long as the refinancing agreement was sufficiently dedicated to that end (see *Patterson v Birdsall,* 64 NY 294, 297-298; *Gerwig v Sitterly,* 56 NY 214, 217; *Gross v Lichtman,* 55 AD2d 670, 671; *Pisano v Rand,* 30 AD2d 173, 176-177; *Hawkins v Maxwell,* 156 App Div 31, 34, affd 215 NY 673; *Warner v Gouverneur's Executors,* 1 Barb 36, 39-40; *Di*

*Giovanni v Gilberto,* 139 Misc 616, 620-622; cf. *Meaker v Fiero,* 145 NY 165, *supra; Henal Novelties & Premiums Corp. v Herman,* 82 Misc 2d 711, 712-713).

DISCUSSION

An analysis of the transaction in the case at bar under these principles cannot be avoided, as suggested by the sponsor, by application of the clean hands doctrine. The predecessor of the usury provision in question here, which has not changed appreciably over the years (see *Webster v Roe,* 126 Misc 792, 795-796), "conferred a special and peculiar privilege upon the actual borrower. It permitted him, without conforming to the general and established principle of equity, to keep the money borrowed, and at the same time compel the cancellation of the usurious security" (*Buckingham v Corning,* 91 NY 525, 530; see *Oppikofer v Murphy,* 146 App Div 581, 583). "Usury is commonly an unconscionable defense, but it is a legal one; and, if proved, courts must sustain it" (*Merrills v Law,* 9 Cow 65, 66) because "equitable considerations cannot be indulged when, as here, a statute, specifically condemns an act" (*Matter of Dane,* 55 AD2d 224, 226). Nothing in the present record, moreover, demonstrates that the plaintiff tenants are estopped *in pais* through the actions of their counsel (see *Payne v Burnham,* 62 NY 69; *Verity v Sternberger,* 62 App Div 112, affd 172 NY 633; *Hungerford Brass & Copper Co. v Brigham,* 47 Misc 240, 244-247).

Since the 13.5% interest rate adopted on the day of the transaction in question exceeded the usury ceiling of 10.25% fixed in 3 NYCRR 4.1 (see General Obligations Law, § 5-501, subd 1), and the transaction was not of the kind for which origination fees or points were authorized (3 NYCRR 4.2 [a]), the sponsor's financing agreement was apparently usurious if it did, in fact, constitute a loan of money.

The tenants attempt to avoid any characterization of their transactions as sales instead of loans by reiterating some of their arguments before Special Term: First, they point out that the sponsor was a legal entity distinct from the co-operative housing corporation, which issued the shares for which the notes were made by the tenants as

purchasers, and that maintenance of this legal distance was essential to the sponsor's favorable position as a taxpayer enjoying capital gains treatment upon the sale of real estate rather than ordinary income treatment for multiple sales of shares in the corporation, as disclosed in the sponsor's prospectus, which was required by section 352-e of the General Business Law to be accurate and complete. Second, the tenants argue that the corporation, for its part, was legally unable to issue shares on credit under section 504 of the Business Corporation Law, under which it was formed; therefore, it could not accept the tenants' notes in order to finance the subscriptions, and the sponsor — if considered to be in the corporation's shoes — could not do so either. Consequently, they argue, the cooperative conversion could succeed only if the sponsor's role were circumscribed within that appropriate to an arm's length lender.

The tenant's theory ignores the reality of the parties' transaction by deleting from the flow of consideration under their tripartite agreement (sponsor, corporation and tenants) the sponsor's consideration — its real property — conveyed to the corporation. Rather than sitting down together at closing to pass cash around a table from sponsor to tenants to the corporation and back again to the sponsor in order to support, respectively, the tenants' transfer of notes to the sponsor, the corporation's shares to the tenants and the sponsor's real property to the corporation, the parties' arrangement accomplished the same legal and practical result: the sponsor capitalized the corporation not with cash, but with real property; the corporation (controlled by the sponsor) issued stock to the tenants; and the tenants issued notes to the sponsor as the necessary inducement for the sponsor's capitalization of the corporation. In this manner the sponsor managed to preserve sufficient formal distinctions between itself and the corporation without being required to break the chain of nonlending relationships established by the tripartite agreement.

It is obvious that under this transaction the sponsor was not refinancing any pre-existing debt owed the corporation by the tenants because, as correctly noted by the tenants,

they could not be issued their shares in exchange for mere promises to pay. Hence, the question is whether the transaction was a time-price sale involving three parties (see *Tuition Plan v Zicari,* 70 Misc 2d 918, 920-921).

It is equally obvious from the record that the transaction was such a sale. The object of a co-operative conversion is to convey a sponsor's rental property to a corporation formed and temporarily controlled by the sponsor for the very purpose of selling the corporation, and thereby the real property, to third parties (such as the plaintiff tenants). Sponsor financing simply does not constitute money lending. Hence, the usury laws are inapplicable.

Accordingly, Special Term's dismissal of the complaint must be affirmed.

MANGANO, J. P., GULOTTA and BRACKEN, JJ., concur.

Judgment of the Supreme Court, Westchester County, entered August 6, 1981, affirmed, with $50 costs and disbursements.