**Theodore ROZSA, Plaintiff,**

v.

**MAY DAVIS GROUP, INC., Carl Corley, Thomas Baribeau and S.G. Cowen Securities Corp., Defendants.**

**No. 01 CIV. 2622(RWS).**

United States District Court,
S.D. New York.

Aug. 1, 2001.

**528**

McGuire, Kehl & Nealon by Harold F. McGuire, Jr., New York City, for Plaintiff.

Gersten, Savage & Kaplowitz by Leslie K. Case, New York City, for Defendants May Davis Group and Carl Corley.

Butler, Fitzgerald & Potter by Andrew W. Sidman, New York City, for Defendant SG Cowen Securities Corp.

### OPINION

SWEET, District Judge.

Defendant S.G. Cowen Securities Corporation has moved to dismiss the claims set forth in the complaint filed by plaintiff Theodore Rozsa ("Rozsa") pursuant to Rule 12(b)(6), Fed.R.Civ.P. For the reasons set forth below, the motion will be granted.

### The Parties

Plaintiff Rozsa is an 86 year-old Canadian citizen and a resident of the Province of Alberta.

Defendant May Davis Group, Inc. ("May Davis") is a securities broker-dealer incorporated in Delaware and with a place of business in New York.

At all times relevant to this action, defendant Carl Corley ("Corley") was a Senior Account Executive and Registered Options Principal in the New York office of May Davis.

Defendant Thomas Baribeau ("Baribeau") is a resident of California who founded the Nevada corporation, Aid for Humanity and Benevolence Foundation, Inc. ("the Foundation"), in 1999.

Defendant S.G. Cowen Securities Corp. ("SG Cowen") is a New York securities broker-dealer that acted as the clearing broker for May Davis at all times relevant to the complaint.

### Facts

As required in a motion to dismiss pursuant to Rule 12(b)(6), the facts alleged in the complaint are presumed to be true, and all factual inferences will be drawn in the plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993).

The complaint alleges that in late 1999, Baribeau induced Rozsa to wire $5 million to a sub-account at the Foundation and represented that Rozsa would be the sole signatory of the account, and that the money would be invested only in money market funds unless Rozsa otherwise directed. Baribeau represented that Rozsa's funds would be deposited at SG Cowen, and would be used only as "proof of funds" for the other Foundation's depositors' low-risk, high-yield "program trading" in foreign bank instruments, and that Rozsa would receive a share of the profits from each trade.

On December 10, 1999, Rozsa signed a disclosure election and taxpayer identifica-

tion form to open the account. (Compl.Ex. A.) After Baribeau informed Rozsa that May Davis was affiliated with or owned by SG Cowen, Rozsa signed and sent to May Davis a Form W–8, Certificate of Foreign Status on December 13, 1999.

Three days later, Baribeau faxed Rozsa and Corley a letter on Foundation letterhead confirming that the Foundation "released all signatory rights over any movement of [the contemplated $5 million] deposit with Cowen Securities, account HM10585711, credited FOR THE BENEFIT OF, Mr. Theodore Rozsa." (Compl.¶ 13, Ex. B.) The letter further provided that "only Mr. Theodore Rozsa shall have the authority to transfer, obligate, or encumber these funds." (*Id.*) Later on December 16th, Rozsa arranged that $5 million be wired from his Bank of Montreal account in Calgary to a bank account at the Bank of New York in Manhattan, as per Baribeau's instructions. Rozsa sent the wire to be deposited in the name of SG Cowen Securities Corp., "Ref: May Davis Group, for further credit to: Aid for Humanity and Benevolence Foundation, a/c HM10585711 FOR THE BENEFIT OF: Mr. Theodore Rozsa." (Compl.¶ 14.)

The next day, Corley faxed and mailed a letter on May Davis letterhead welcoming Rozsa to the May Davis Group and stating May Davis's objective "to help you build your net worth and manage risk." (Compl.¶ 15, Ex. C.)

Rozsa filled out additional Cowen forms on December 20, 1999, including a Retail New Account Form and a W–8 Certificate of Foreign Status form, reflecting his ownership of the funds in the account, and sent them to Corley at May Davis by overnight delivery for inclusion in his account file.

Rozsa contends that no "program trading" ever took place, and that this investment strategy was fabricated by Baribeau, Corley and May Davis as a means of fraudulently inducing Rozsa to transfer $5 million into the SG Cowen account so they could appropriate it for themselves in subsequent secret and unauthorized wire transfers to Foundation accounts at other banks, and then on to their personal accounts. Specifically, the entire $5 million was wired out of Rozsa's SG Cowen account in unauthorized transfers on February 22, 2000, March 9, 2000, March 15, 2000, March 16, 2000 and March 17, 2000. Baribeau, Corley and May Davis did not advise of any of these transfers. However, SG Cowen did send account statements for February and March 2000 reflecting that the wire transfers had taken place, and that the account balance had dropped to under $100,000 by March 31, 2000.

When confronted, Baribeau falsely represented to Rozsa that his funds had been transferred from May Davis to the Chase Manhattan Bank in New York to facilitate "program trading," and that profits were being generated, but no account statements were available because the "trading cycle" was not yet complete and other depositors and investors were "meddling" and "making mistakes." (Compl.¶ 24.)

On July 31, 2000, Rozsa sent a letter to Corley at May Davis demanding an explanation of the unauthorized transfers. (Compl.Ex. D.) Corley faxed a response on August 6, 2000, in which he acknowledged that he was Rozsa's broker, "not Tom Baribeau's," and falsely representing that he had not discussed Rozsa or his account or with Baribeau. (Compl.¶ 26.)

After becoming aware that the Foundation had a bank account at Washington Mutual Bank in Irvine, California and that some of his money had been transferred to an unidentified bank in South Carolina, Rozsa requested that Corley and May Davis put both banks "on notice."

(Compl. ¶ 27.) Rather than complying with this request, Corley and May Davis instead notified Baribeau about the communication from Rozsa to enable him to transfer any remaining funds out of the Foundation account at Rock Hill Bank & Trust in Rock Hill, South Carolina.

Baribeau, May Davis and Corley arranged for Rozsa to receive a total of $1,400,000 between July and September 2000, which they identified as "program trading profits," plus $95,000 in money market interest and capital gains on the funds in the May Davis account. These were the only returns Rozsa received on his $5 million, which principal has not been returned to him.

### Procedural History

The complaint, filed on March 27, 2001, alleges that May Davis, Corley and Baribeau violated the Racketeering Influenced and Corrupt Organizations Act ("RICO") (Count I), that all of the defendants breached their fiduciary duty to Rozsa (Count II), that May Davis and Cowen breached their contract with Rozsa (Count III), and that all of the defendants unlawfully converted Rozsa's five million dollars (Count IV).

SG Cowen filed this motion to dismiss on May 11, 2001, in lieu of filing an answer. Rozsa filed a brief in opposition on May 24, 2001, and the motion was deemed fully submitted after oral argument on June 6, 2001.[1]

### Discussion

#### I. Legal Standard for Failure to State a Claim

In reviewing a motion to dismiss under Rule 12(b)(6), review must be limited to the complaint and documents attached or incorporated by reference thereto. *See*

*Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991). Courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). *See also Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986).

"For purposes of a motion to dismiss, [the Second Circuit has] deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ..., as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (*citing Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Kramer*, 937 F.2d at 774; and *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)). The documents attached to the complaint as Exhibits A–D are appropriately considered under this standard.

#### II. Breach of Fiduciary Duty

■ SG Cowen has moved to dismiss the breach of fiduciary duty claim against it on the grounds that the complaint alleges that SG Cowen was merely a "clearing broker" that settled trades for May Davis

---

1. SG Cowen has withdrawn its Rule 9(b) motion in light of Rozsa's acknowledgment that the complaint does not sound in fraud. (Def. Repl. Br. at 7 n. 3.)

rather than acting as a personal stockbroker for Rozsa (Compl.¶¶ 5, 23), and as such, SG Cowen had no fiduciary duty to Rozsa. In contrast, Rozsa contends that SG Cowen had a fiduciary duty to him because it was a stockbroker with whom he deposited funds (Compl.¶ 11).

 A fiduciary relationship exists under New York law " 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1987) (citation omitted). Under ordinary circumstances, a broker owes no fiduciary duties to a purchaser of securities, *see Perl v. Smith Barney Inc.,* 230 A.D.2d 664, 666, 646 N.Y.S.2d 678, 680 (N.Y.App.Div.1996), except those duties necessarily attendant to the "narrow task of consummating the transaction requested." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 536 (2d Cir.1999) (citations omitted).

The complaint alleges that May Davis had direct contact with Rozsa and coordinated the opening and use of the account at SG Cowen. (Compl.¶¶ 12, 13, 15, 16.) Assuming these facts to be true, May Davis was functioning as an "introducing broker," which but needed the assistance of a third party, or "clearing broker," to settle and complete the investor's transactions. *See In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 73 (Bkrtcy.S.D.N.Y. 1996); *Katz v. Financial Clearing & Services Corp.,* 794 F.Supp. 88, 90 (S.D.N.Y. 1992). As Rozsa's agent, May Davis may well have assumed a fiduciary relationship with Rozsa in connection with the agreed upon transaction. *See Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 536 (2d Cir.1999) (discussing split among

New York courts about existence and scope of fiduciary duty ordinary broker owes to investor).

In contrast, the complaint specifically alleges that SG Cowen was the "clearing broker" for May Davis. (Compl.¶¶ 5, 23.) Clearing brokers, unlike "introducing brokers," generally have agreements with other broker-dealers, rather than individual investors, governing the mechanics of order entry, confirmation and the completion of trades. *See id.* Due to this contracting scheme, New York courts have held that clearing brokers generally have no fiduciary duty to individual investors. *See Edwards & Hanly v. Wells Fargo Securities, Corp.,* 602 F.2d 478, 484 (2d Cir.1979) ("a clearing agent, is generally under no fiduciary duty to the owners of securities that pass through its hands") (citation omitted), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Connolly v. Havens,* 763 F.Supp. 6, 10 (S.D.N.Y.1991) (same); *Dillon v. Militano,* 731 F.Supp. 634, 636 (S.D.N.Y.1990) (same); *Stander v. Financial Clearing & Services Corp.,* 730 F.Supp. 1282, 1286 (S.D.N.Y.1990) (same).[2] This holds true even where, as here, the clearing broker holds an investor's funds for trading. *Flickinger v. Harold C. Brown & Co., Inc.,* 947 F.2d 595, 597, 599 (2d Cir.1991) (finding that clearing broker that kept custody of investor's funds and securities had no fiduciary duty to him).

 Clearing brokers may have a fiduciary duty to investors in certain extenuating circumstances. *See, e.g., Goldman v. McMahan, Brafman, Morgan & Co.,* No. 85 Civ. 2236(PKL), 1987 WL 12820, *22 (S.D.N.Y. June 18, 1987) (finding that complaint adequately made out a claim for clearing agent's breach of fiduciary duty

---

**2.** *See also Lester v. Basner,* 676 F.Supp. 481, 483–84 (S.D.N.Y.1987) (clearing broker is not the agent of introducing broker); *Ahn v. Roo-* *ney, Pace Inc.,* 624 F.Supp. 368, 370–71 (S.D.N.Y.1985) (same).

due to claim that agent "actively engaged ... in creating fraudulent trading losses" rather than acting as "a mere conduit."). However, the complaint in this action does not allege any facts, such as, for example, the existence and violation of a customer agreement between Rozsa and SG Cowen, upon which such a finding could be based. *Cf. Conway v. Icahn & Co.*, 16 F.3d 504, 509 (2d Cir.1994). Rather, the complaint alleges only that the other defendants "induced SG Cowen ... to transfer Rozsa's funds...." (Compl.¶ 19.)

In short, the complaint fails to allege facts on which the Court could find that SG Cowen acted as anything other than a generic clearing agent that acted only through May Davis. As a result, SG Cowen had no fiduciary duty to Rozsa.[3] SG Cowen's motion to dismiss the breach of fiduciary duty claim is granted for failure to plead facts upon which a claim for relief may be granted.

### III. *Breach of Contract*

SG Cowen next moved to dismiss the breach of contract claim against it on the grounds that the complaint fails to allege that Rozsa and SG Cowen ever entered into a written contract. In opposition, Rozsa contends that his contract claim in fact relies on a theory that when SG Cowen accepted his funds, it created either a bailment contract or a "mutuum."

First, the facts alleged do not support a finding that there was a "mutuum." A "mutuum" is a vestige of Roman law defining a loan of money or property that may be used by the transferee, who must then return either the actual money transferred, or its equivalent, to the transferor. *See DeSimon v. Ogden Associates*, 88 A.D.2d 472, 454 N.Y.S.2d 721, 726 (N.Y.App.Div.1982). The complaint alleges only that SG Cowen accepted a transfer of funds with a note that the funds were "for the benefit of Mr. Thoedore Rozsa" (Compl.¶ 14), not that SG Cowen was authorized to "use" the funds.

A bailment of money is created under New York law when a special or specific bank account is created, title to the funds remains with the account holder, and the funds are separated from other deposits. *See Peoples Westchester Savings Bank v. Federal Deposit Ins. Corp.*, 961 F.2d 327, 330 (2d Cir.1992). "Whether an account is general or specific depends upon the mutual intent of the parties." *Swan Brewery Co. v. United States Trust Co.*, 832 F.Supp. 714, 718 (S.D.N.Y.1993). Absent evidence of intent, New York law presumes that deposits are general rather than specific. *Id.* at 718–19. As the court recognized in *Hossain v. Rauscher Pierce Refsnes, Inc.*, 46 F.Supp.2d 1164 (D.Kan. 1999), an investor does not seek to have the exact same funds returned after depositing them with a clearing broker:

> When plaintiff [investor] deposited his money with the defendant [clearing agent], he did not intend for the defendant to return the identical money back to him. To the contrary, plaintiff deposited the money with hopes of increasing

---

**3.** *Press, supra,* did not address the line of cases holding that clearing brokers were fiduciaries and therefore does not foreclose this holding. Even if *Press* could be construed to address the question of clearing brokers' fiduciary status, it held only "that the duties a broker owes to its client requires attention to the specific circumstances of the relationship between the broker and the client and the scope of the matters entrusted to the broker." *Kwiatkowski v. Bear, Stearns & Co., Inc.*, No. 96 Civ. 4798(JGK), 1999 WL 1277245, *10 (S.D.N.Y. Nov. 29, 1999). As set forth above, SG Cowen had an arm's length relationship with Rozsa mediated by May Davis. These specific circumstances do not warrant a finding that SG Cowen was a fiduciary under the reasoning of *Press*.

the amount of his deposit. Because the deposit cannot be classified as a special deposit, no bailment relationship existed between plaintiff and defendant.

46 F.Supp.2d at 1171 (construing Kansas law, which is analogous to New York law of bailments).

▮ Bailment is a contractual arrangement, the terms of which may be either express or implied. *See Zurich Ins. Group v. Grandurismo, Inc.*, No. 00 CIV 980(AGS), 2000 WL 1677941, *3 (S.D.N.Y. Nov. 8, 2000); *U.S. v. $79,000 in Account Number 2168050/6749900 at Bank of New York*, No. 96 CIV. 3493(MBM), 1996 WL 648934, *5 (S.D.N.Y. Nov. 7, 1996) ("A bailment is a contractual arrangement and, as in any contract, both parties must assent to the relationship... A bailment cannot be created absent intent by the alleged bailee to create one."). Where there is no written contract, the party asserting a bailment must establish, in light of all the circumstances, that the parties agreed to a contract with definite terms. *See Charles Hyman, Inc. v. Olsen Indus., Inc.*, 227 A.D.2d 270, 642 N.Y.S.2d 306, 309–10 (N.Y.App.Div.1996) (*citing Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989)).

In *Pagliai v. Del .Re*, No. 99 Civ. 9030(DLC), 2001 WL 220013 (S.D.N.Y. March 7, 2001), the court intimated that a contract was not required for a bailment to exist. The plaintiff in *Pagliai* had left a painting with the defendant art gallery for appraisal, and the defendant subsequently placed the painting for sale at auction by Christie's to pay off an unrelated debt. Although stating in passing that the bailee's consent was not required to create a bailment, the *Pagliai* court also noted that a bailment could be established by way of an implied contract, and, in finding that a bailment existed, did not specify whether

the defendant had consented thereto. *Id.* at *5. *Pagliai* stands in direct contradiction to *Zurich*, in which the Honorable Allen G. Schwartz held that whether implied or express, "a defendant as bailee cannot be liable if there is no contract between the parties to the action." *Zurich*, 2000 WL 1677941, at *3.

The rule that a bailment is contingent on the existence of an express or implied contract is longstanding. *See, e.g., First Nat'l Bank v. Ocean Nat'l Bank*, 60 N.Y. 278 (1875) ("Liability is always grounded in contract, and one cannot be made the bailee of another's property without his consent."); *Coons v. First Nat. Bank of Philmont*, 218 A.D. 283, 283–284, 218 N.Y.S. 189, 189–90 (N.Y.App.Div.1926) ("The relation between a bailor and a bailee is fixed by contract, either express or implied, and the rights and liabilities of the parties must be determined from the terms of the contract, if express, or, if implied, under the general principles of law and the surroundings and attending circumstances; but always liability is grounded in contract.").

▮ Given the unique relationship between investor and clearance broker as mediated by the introducing broker, as opposed to typical cases involving real property, a defendant clearance broker's consent to an implied contract is fundamental to finding that it accepted a bailment of an investor's funds..

▮ To establish the existence of a contract under New York law, a plaintiff must allege an offer, acceptance, consideration, mutual assent, and an intent to be bound. *Louros v. Cyr*, No. 00 CIV 2166 LAP, 2001 WL 2392506, *9 n. 5 (S.D.N.Y. Apr. 17, 2001). The complaint in this action alleges only that by accepting his $5 million, SG Cowen entered into a contract agreeing, *inter alia*, to use his funds only

as authorized by him, and that it breached that contract by transferring funds out of the account without his authorization. (Compl.¶¶ 43–45.) However, Rozsa sent the letters providing these terms to Conley at May Davis, not to SG Cowen.

Accordingly, the complaint fails to assert facts from which it can be inferred that SG Cowen assented to the implied contractual terms Rozsa alleges and thereby created a bailment. SG Cowen's motion to dismiss the breach of contract claim is therefore granted. *See, e.g., Kreiss v. McCown De-Leeuw & Co.,* 37 F.Supp.2d 294, 298 (S.D.N.Y. March 4, 1999) (dismissing breach of contract claim for failure to plead every essential element thereof).

### IV. *Conversion*

To withstand a motion to dismiss, a conversion claim must allege (1) an actionable wrong other than breach of contract caused plaintiff's injury; (2) plaintiff had ownership of the funds at the time they were converted; (3) defendant exercised unauthorized dominion over the funds; (4) the funds were specific and identifiable; and (5) the defendant was to have treated the funds in a particular manner but they were not so treated. *See Citadel Management Inc. v. Telesis Trust, Inc.,* 123 F.Supp.2d 133, 148 (S.D.N.Y. 2000). A complaint that offers no factual basis for inferring conversion must be dismissed. *Pinnacle Consultants, Ltd. v. Leucadia National Corp.,* 923 F.Supp. 439, 447 (S.D.N.Y.1995), *aff'd,* 101 F.3d 900 (2d Cir.1996).

The complaint fails to allege facts that support either the third or fifth elements of conversion because, as set forth above, the only communications Rozsa alleges pertaining to the use of the funds are between himself and May Davis, not SG Cowen. Moreover, although the complaint has attached various correspondence and bank documents, no specific account information has been alleged. As a result, the complaint fails to allege that the funds were in a specifically identifiable account, as required to sustain a conversion claim.

Neither of the cases Rozsa cites deals with the investor/clearance broker relationship, and both are inapposite. First, although the court in *Payne v. White,* 101 A.D.2d 975, 477 N.Y.S.2d 456, 458–59 (N.Y.App.Div.1984), noted that "a person entitled to a bank deposit which has been paid to another person without authority ... has a [conversion] cause of action...," that case involved the withdrawal of funds by a joint account holder rather than the transfer of funds by a clearance broker who is not alleged to have had a contract with the plaintiff. Moreover, the unauthorized wire transfer in *Manufacturers Hanover Trust Co. v. Chemical Bank,* 160 A.D.2d 113, 559 N.Y.S.2d 704, 712 (N.Y.App.Div.1990) stated a conversion claim because the defendant bank specifically ignored the plaintiff's order to credit the funds to a specific account. In contrast, the facts alleged here suggest that Rozsa ordered May Davis to limit its use of the funds as per their agreement, but that Rozsa had no such agreement with SG Cowen.

SG Cowen's motion to dismiss the conversion claim is granted.

### *Conclusion*

For the foregoing reasons, the motion to dismiss is granted without prejudice. Rozsa may replead within thirty (30) days of the date this opinion is filed.

It is so ordered.