SINDLINGER ET AL. *v.* DEPARTMENT OF FINANCIAL INSTITUTIONS.

[No. 26,674. Filed February 7, 1936. Rehearing denied April 29, 1936.]

*Seebirt, Oare, Deahl & Omacht,* for appellants.

*Roland Obenchain,* for appellee.

HUGHES, J.—On July 25, 1933, the Department of Financial Institutions of the State of Indiana took possession of the business and property of the Union Trust Company of South Bend, Indiana, for the purpose of liquidation. On October 13, 1933, said department filed in the St. Joseph Superior Court its petition number 27, asking for declarations, decrees, and orders relating to "savings investments" accounts of the said Union Trust Company.

It appears that the Union Trust Company of South Bend, Indiana, was a loan, trust and savings deposit company organized in 1908 under an act entitled "An Act authorizing the organization and incorporation of loan, trust and safe deposit companies and defining their powers, rights and duties, and other matters connected therewith," approved March 4, 1893, and continuously from the date of organization until July 24, 1933, exercised the trust powers granted by said act, and from and after the amendment of 1921 of section 10 of said act, said trust company exercised the powers conferred on banks by the laws of this state and continued so to exercise such powers, until July 24, 1933. That in 1922 said trust company became associated with the First National Bank of South Bend, Indiana, and thereafter occupied the same banking house in South Bend, and after said year of 1922 said trust company did not receive or carry commercial demand accounts, but thereafter and until December 2, 1929, limited itself to the receiving and carrying of savings deposits bearing four (4%) per cent interest and to receiving and carrying the deposits of public money deposited by boards of finance under the depository laws of the State of Indiana and to occasional other interest bearing deposits; that after December 2, 1929, and until June 4, 1931, said trust company continued to receive deposits of the char-

acter just described, and from time to time during said period borrowed money from other banks and became indebted to persons and corporations.

That on November 26, 1929, the board of directors of said trust company, after considering the establishment of a savings investment department therein as a means of competition with local building and loan associations, adopted the following resolution:

"The officers were given the following instructions to organize and equip a new department in the Union Trust Company to be known as Savings Investment Department; this department shall receive deposits upon which the Union Trust Company shall pay $5\frac{1}{2}\%$ interest per annum, credited to the depositor. The minimum initial deposit received shall be $100. The rules and regulations of this department shall be prepared and promulgated by the officers and reported to this board at its next meeting;"

that pursuant to said resolution the officers of said trust company thereupon devised a printed outline of a plan which was handed out to the customers of said trust company and to members of the public both inside and out of its banking house.

We deem it expedient for the purposes of this opinion to set out the plans and rules as outlined, nothwithstanding the length of the same. The following are the plans and rules:

| A CASE OF GOOD JUDG-MENT | "BANK IT AND IT'S YOURS" | SAVINGS INVESTMENTS $5\frac{1}{2}\%$ UNION TRUST COMPANY South Bend Indiana |
|---|---|---|

Reverse.

88

## 5½% INTEREST ON YOUR SAVINGS
### As An Investment

The Savings Investment Department of the Union Trust Company has been in operation for one year and has proven very popular ... The offer of 5½% interest to savers and investors is something quite beyond the customary range of ordinary banking service.

The initial deposit may be $100 or over; thereafter any sum, large or small, may be added to the accounts. ... The depositor is relieved of all anxiety of selecting good investments, and will not be worried over market fluctuations. When you invest in our Savings Investment Department, you get all of the principal plus a generous yield of 5½% interest ... compounded semi-annually. Put your money to work safely and profitably by opening an account in this department. The speed with which you accumulate money is largely governed by the steps you take. You will be "5½" steps ahead in building financial independence when you open a Savings Investment Account at the

In selecting the field where you show your savings ... it is well to use the utmost care!

### UNION TRUST COMPANY
Affiliated with The First National Bank
Michigan Street at Jefferson, South Bend, Indiana.

*Outside*

### THE MOST CONVENIENT WAY
### TO INVEST MY SAVINGS FOR
### GREATER INTEREST
#### With Absolute Safety

### HOW
### YOUR SAVINGS
### CAN EARN

*Inside*

## YOUR QUESTIONS ANSWERED
about our new
## SAVINGS INVESTMENT DEPARTMENT

The function of this new department is to serve people who do not wish to speculate or concern themselves with the intricacies of investing money; this department offers them a convenient and easily understood investment of a more or less permanent nature which will not fluctuate in value and which will yield one hundred cents on the dollar with $5\frac{1}{2}\%$ interest.

1. What is a Savings Investment Account?

   A depository for your savings where you obtain a higher rate of interest than is paid by the regular savings account.

2. In what way does a Savings Investment Account differ from the regular saving's account?

   Your Savings Investment Account draws $5\frac{1}{2}\%$ interest and is subject to restrictions with regard to withdrawal. In case of necessity depositors may be required to give notice of their intention to withdraw.

3. Why is this bank able to pay a higher rate of interest on money in a Savings Investment Account?

   The only way the bank can make this department earn enough money to pay this high rate of interest is to have substantially all of the monies received for investment loaned out all of the time, excepting the minimum required by the law to be held in cash. Not only this, but the bank must keep this money loaned out on real estate mortgages, and other securities, that ordinarily are not collectible on short notice.

4. How will interest be paid and at what time of the year?

   Accrued interest will be placed to the credit of the investor's account January 1st, April 1st, July 1st, and October 1st, and if not withdrawn will draw interest from these dates.

5. Is it advisable to keep both my regular savings account and a Savings Investment Account?

For those not having checking accounts it is advisable to keep a regular Savings Account that will meet your current demand for money, the Savings Investment Account to be used as a more permanent investment.

6. Is my money just as safe in a Savings Investment Account as in a regular savings account?

Yes. Money received in this department will be invested in first mortgages, and high grade securities.

7. In what way am I restricted from drawing money out at any time?

The investor must remember that his money is loaned out most of the time, and therefore he may at any time be required to give notice. The reasonable expectation is that investors ordinarily will be able to withdraw whenever they wish to and that notice will only be required on rare occasions.

8. What amount is required to open a Savings Investment Account?

One hundred dollars or more, up to $10,000, is accepted from any one depositor as an initial deposit.

9. Is there any advantage in a Savings Investment Account over investment securities, such as bonds, etc.?

The popular belief that investing money safely is a simple matter is fallacious. Few things done in the business world are more difficult. Even those who spend a lifetime in the study of investments sometimes find themselves at a loss to know what to do. Investing money is a specialty, and it can be done advantageously only after long and close study and the development of a keen sense of values.

The Savings Investment Account relieves the investor of the difficulty of making safe investments, and also of the anxiety that the investment will depreciate in value. Every investor

in this department is sure to receive 100 cents per dollar on the investment, plus accrued interest.

10. Why does the Union Trust Company recommend that I open this type of account with my savings?

The purpose in establishing this department was to provide a convenient and easily understood investment that will pay a relatively high rate of interest and at the same time be safe. This is to relieve people who do not have time or inclination to study the intricacies of ordinary investments. The Union Trust Company believes that in establishing this Savings Investment Department a real service is being offered to the community.

11. Where do I go to open a Savings Investment Account?

As you enter the bank the Savings Investment Department is on your right, about half way down the lobby.

12. When may I open this account?

Any time until the close of business on January 10, 1930. Your account will then begin to draw interest at the rate of $5\frac{1}{2}\%$ per annum from January 1, 1930. The next period for opening such an account ends on April 10, 1930, and deposits made up to that time bear interest from April 1, 1930.

That the officers of said Trust Company, pursuant to said resolutions of November 26, 1929, prepared in printed form a deposit book setting out among other things rules and regulations governing savings investments. Said rules and regulations as there set out are as follows:

1. Union Trust Company of South Bend will maintain a segregated investment department, in which it will receive and invest special deposits to be known as "Savings Investments."

2. The minimum initial deposit in this department shall be one hundred dollars. The Company

will receive deposits up to ten thousand dollars from any one individual, firm or corporation without special arrangement, but for any greater amount it will require a special agreement.

3. It will invest the deposits received in this department in first mortgage and approved collateral loans and high grade securities. It will keep these loans and securities together with the uninvested cash belonging to this department separate from all of the other assets belonging to the Company, and will treat them as a special fund which, though owned by the Company, is set aside to determine the order of payment of these savings investments.

4. It will at all times keep in this special fund in this department a total of such loans, securities, and cash, at least equal to the total of the savings investments held in the department.

5. It is the policy of the Company to pay any and all withdrawals on demand, but the laws of the state governing trust companies provide that a notice may be required in advance and the directors of the Trust Company reserve the right to require the statutory notice. At such times this department will cease making new loans and proceed to realize on the assets it holds, and, as moneys are realized through this procedure, will pay the deposits sought to be withdrawn in the order in which notices of withdrawal have been received. Depositors in this department will be paid only out of the separated assets of this department and will not be paid out of other funds belonging to the Union Trust Company.

6. Interest at the rate of five and one-half per cent (5½%) will be paid on the deposits in this department according to the following rules: Deposits made prior to January 10th will begin to bear interest January 1st each year; those prior to April 10th will begin to bear interest April 1st each year; those made prior to July 10th will begin to bear interest July 1st each year and those made prior to October 10th will begin to bear interest October 1st each year. Interest will be credited every six months upon sums which have been left on deposit six months from the beginning of the above interest periods, except that no interest will be allowed on a balance of less than one hundred dollars. In-

terest may be withdrawn in case or left to draw interest as a deposit.

7. The possession of this pass book shall be prima facie evidence to the Bank of the holder's right to withdraw funds to its credit, and this Company shall not be liable for payments made to any one not the rightful holder of the same unless notice shall have been previously given that this book has been lost or stolen. It is of the greatest importance therefore that the Bank should have immediate notice whenever any pass book has been lost, stolen or has in any way passed from the possession of the rightful owner. No payment shall be made upon a pass book alleged to be lost until the Depositor has furnished such proofs and has complied with such requirements as shall be determined by the Company.

8. Only cash actually received, whether over the counter or by mail, will be deemed deposited for the purpose of computing interest or otherwise. Checks, drafts, money orders and other similar items including any drafts on this Bank, may be received in the discretion of the Bank for transmission only, and will not be deemed deposited until final payment is actually received on the same in manner satisfactory to the Bank. Whenever any such items are delivered by the Bank to their agents for collection, the responsibility of the Bank shall be limited to the exercise of care in the selection of such agents.

9. Depositors, on signing the signature card, thereby agree and assent to these rules and regulations, which may be altered or amended at any time, and shall as amended be obligatory and binding on depositors after due notice posted in the lobby of the Trust Company.

10. The Trust Company reserves the right to terminate this savings investment agreement on any interest paying date, by posting a thirty (30) days' notice in the lobby of the Trust Company.

11. By the acceptance of this book the holder consents to and agrees to be bound by the above rules.

The petition of the Department of Financial Institutions was contested by the appellants. They contended

that a trust was created between the Trust Company and each of its 5½% savings depositors with respect to the latter's savings investments accounts deposits and that the relation of trustee and *cestui que* trust was created and not the relation of creditor and debtor.

We are first confronted with the proposition as to whether or not the Union Trust Company had power to do the things contained in the rules as heretofore set out. In other words, did it have power to establish a so-called "Savings Investment Department." As to this we think there can be no doubt, and without elaborating on this question we merely wish to refer to Section 10 of the Acts of 1893, p. 344, as amended by the Acts of 1921, p. 44, same being Section 3950, Burns' Annotated Statutes 1926 (Repealed, Acts 1933, Chapter 40, Sec. 365), and being the section of the act under which the Union Trust Company was organized. It appears to the court that under said section power is conferred to do the things that the company did in the instant case, and there is no statute prohibiting it. And furthermore a bank deposit is subject to any arrangement which the depositor and the bank may make concerning it, so long as the rights of third parties are not injuriously affected. *Lamb* v. *Morris* (1889), 118 Ind. 179, 20 N. E. 746; *Shopert* v. *Indiana National Bank* (1907), 41 Ind. App. 474, 83 N. E. 515; *Rottger* v. *Delta Delta Delta Realty Corp.* (1934), 98 Ind. App. 680, 184 N. E. 412.

All of the questions presented in this appeal revolve around the one question, to wit: Was the relation of the Union Trust Company and the holders of the 5½% savings investments account that of trustee and *cestui que* trust or that of debtor and creditor.

The lower court held that the relationship was that of debtor and creditor, and from this holding the appellants appeal. The error assigned is the overruling of

appellants' motion for a new trial which alleged that the decision of the court is not sustained by sufficient evidence and is contrary to law.

We think it must be conceded that the rules as set forth in the pass book of the company is the contract between the company and the depositors of "Saving Investments" accounts. The advertising matter which was distributed to the customers as an inducement to the depositors may also be considered along with the contract. And for the purpose of construing and determining the meaning and purpose of the contract it must be considered in its entirety.

Let us first consider the advertising matter as an inducement to the depositors. It first says: "The Savings Investment Department of the Union Trust Company has been in operation for one year and has proven very popular. . . . The offer of 5½% interest to savers and investors is *something quite beyond the customary ranges of ordinary banking service.*" (Our italics.) And again it says: "When you invest in our Savings Investment Department, you get all of the principal plus a generous yield of 5½% interest." And again: "Is my money just as safe in a Saving Investment Account as in a regular savings account? Yes, money received in this department will be invested in first mortgages, and high grade securities." And further: "The Savings Investment Account relieves the investor of the difficulty of making safe investments, and also the anxiety that the investment will depreciate in value. Every investor in this department is sure to receive 100 cents per dollar on the investment, plus accrued interest." And again: "Why does the Union Trust Company recommend that I open this type of account with my savings? The purpose in establishing this department was to provide a convenient and easily understood investment that will pay a relatively high rate of inter-

est and at the same time be safe. This is to relieve people who do not have time or inclination to study the intricacies of ordinary investments." All of this advertising was for the purpose of showing that the offer and plan of 5½% interest on investments, as stated, was something quite beyond the customary range of ordinary banking. In other words, the company said to the depositors that it was inviting them to do business with it, not in the ordinary way of banking business, but in a special and specific manner. The specific terms and conditions were set out in eleven rules and regulations as set forth in the pass book. We desire to call specific attention to some of these rules and parts thereof.

No. 1. "Union Trust Company of South Bend will maintain a segregate investment department, in which it will receive and invest special deposits to be known as 'Savings Investments.' "

No. 3. "It will invest the deposits received in this department in first mortgage and approved collateral loans and high grade securities. It will keep these loans and securities together with the uninvested cash belonging to this department separate from all the other assets belonging to the company, and will treat them as a special fund which, though owned by the company, is set aside to deteremine the order of payment of these savings investments."

No. 5. "... Depositors in this department will be paid only out of the separated assets of this department and will not be paid out of other funds belonging to the Union Trust Company."

When the rules are considered as a whole and especially in view of rules No. 1, 3, and 5, we must conclude that the deposits were special deposits for a special purpose and not general. The first rule specifically provides that "Savings Investments" are

to be special deposits. The language used in this rule is plain and unambiguous and not open to question as to its meaning. When the language of a contract is clear and unambiguous, and the intention of the parties is unquestioned, effect should be given to the contract as written.

Rule 1 provides that the special deposits were to be known as "Savings Investments" and Rule 3 provides that such deposits will be invested in first mortgage and approved collateral loans and securities and they will be kept separate from all the other assets of the company and treated as a special fund, and rule 4 provides that the company will keep in the special fund in the department a total of the loans, securities and cash at least equal to the total of the savings investments. Rule 5 provides in part that depositors will be paid only out of the separated assets of the department and will not be paid out of other funds belonging to the Union Trust Company. All of these provisions certainly are in keeping with the advertising matter that the plan offered was "beyond ordinary banking service," and in our judgment such arrangement took such banking out of the ordinary relationship of debtor and creditor. If it did not then all rules of construction and interpretation of contracts must be laid aside.

We think it must be admitted from the clear and unequivocal language of the contract that: (a) the deposits were to be special deposits to be known as "Savings Investments"; (b) that the special deposits were to be invested in first mortgage and approved collateral loans and high grade securities; (c) that the bank would keep loans and securities with the uninvested cash separate and apart from all of the other assets belonging to the company; and (d) that depositors in the investment department would be paid only out of the separated assets of that department and would not be paid

out of other funds belonging to the Union Trust Company. The foregoing propositions must be admitted as established and they clearly take the case out of the ordinary rules of banking, as stated in the advertising matter, and out of the general rule of debtor and creditor. It is expressly provided by the rules that the deposits were for a specific purpose—to be invested in first mortgage and approved collateral loans and high grade securities. This can not successfully be denied.

It is shown that on November 26, 1930, the total amount of "savings investment" accounts on the books of said trust company was $811,382.88; that on said date mortgage notes of the face value of $805,284.00 were selected by one or more officers or employees of said trust company from among the mortgage notes of said trust company and around each of the mortgage notes so selected was placed a paper band and bearing stamped on the outside thereof the words "Saving Investment Mortgages"; that from time to time additional mortgage notes were banded in the above manner and placed in the bundle of banded notes.

That after July 24, 1933, the Department found among the assets of said trust company certain banded notes and corresponding debtor ledger sheets marked "S," and the mortgage notes so banded amounted to $547,276.71.

It is significant that on November 26, 1930, that the amount of saving investment accounts was $811,382.88 and that on said date notes of the face value of $805,284 were selected by the company and marked "Saving Investment Mortgages." This at least shows that the company recognized the terms of their contract—to keep the funds segregated and to keep at all times in the special fund a total of such loans, securities and cash equal to the total of the savings investments.

That the trust company intended that the "Savings

Investments" were considered by the company to be special deposits is further shown by the fact that the ledger sheets used and stamped "Savings Investments" were of a different colored paper than those used for the general savings accounts and were also given a different series of numbers. And it also appears from the stipulation of the parties that from and after November 26, 1930, the Union Trust Company, in its general ledger, carried a control account denominated "Mortgage Loans," and that by two subsidiary accounts this control account was broken down and divided into accounts separately entitled "Mortgage Loans" and "Savings Investment Mortgage Loans" and that in the subsidiary account entitled "Mortgage Loans" were carried all of the mortgage loans of the Union Trust Company except those designated "Savings Investment Mortgage Loans."

Regardless, however, of the method of bookkeeping the rights of a beneficiary under a trust can not be jeopardized thereby. As said in the case of *Terre Haute Trust Co.* v. *Scott* (1932), 94 Ind. App. 461, 470, 181 N. E. 369, "The trust company acting in the capacity of trustee was necessarily required to keep a record and account of the cash transactions in connection with the trust; the method of keeping this record could not in any way jeopardize the rights of the beneficiary under the trust." A trust once established can not be reduced to the relationship of debtor and creditor by a bookkeeping method to the injury of the *cestui que* trust.

Bank accounts may be divided into three classes: (1) General; (2) Special; and (3) For special purposes. It has been said:

"The distinction between a special deposit and a general deposit is generally held to be that the subject of a general deposit is mingled with the gen-

eral assets of the depository, whose property it becomes, and its separate identity is lost, and the relation between the bank and the depositor is that of debtor and creditor; while the subject of a special deposit is to keep safely, separate and distinct from the general assets of the bank, as the title remains in the depositor, who is entitled to receive back the identical thing deposited, and the relation assumed between the depositor and the bank is that of bailor and bailee."

See note to *Fogg* v. *Tyler* (1912), 109 Me. 109, 82 Atl. 1008, Ann. Cas. 1913 E., pp. 41, 45. And in the case of *In re Warren's Bank* (1932), 209 Wis. 121, 124, 244 N. W. 594, 86 A. L. R. 371, it is said:

"It seems to be well settled that a deposit made in a bank for a specific purpose, and for that alone, partakes of the nature of a special deposit and does not establish the relation of debtor and creditor between the depositor and the bank, but establishes a fiduciary relation which is sometimes declared to be that of principal and agent, while some counts hold that a trust relation is created."

See 1 Morse on Banking, §185, and note.

In the case of *Wilson et al.* v. *Dawson et al.* (1876), 52 Ind. 513, 515, where money was deposited for a special purpose, the court said:

"It is a general rule, that funds deposited in a bank for a special purpose, known to the bank, can not be withheld from that purpose, to the end that they may be set off by the bank against a debt due it from the depositor."

In the instant case the money was deposited for a specific purpose under an agreement with the company and it was beyond the power of the company to withhold or divert the money deposited for any other purpose.

". . . if there is no *mala fides* connected with the transaction the character of the deposit, whether general or special, is to be determined from the contract between the depositor and the bank. If that contract establishes a trust relation between the depositor and the bank and takes away from the

bank the right to use the fund deposited as it uses its general deposits, then it is a special deposit. If, however, it is agreed, and understood, either expressly or impliedly, that the bank may use this deposit as it uses its general deposits, then, in the absence of any wrongful intent, the deposit is a general one, no matter what the relation between the depositor and other parties may be."

*Mo. Mut. Assn.* v. *Holland Banking Co.* (1927), 220 Mo. App. 1256, 1263, 290 S. W. 100.

Under the above statement of the law, and we believe it to be a true statement, can there be any question as to the character of the deposits and the relationship created in the instant case? Under the contract the right of the trust company to use the funds deposited as it used its general deposits was clearly taken away and they could only be used for a specific purpose. And as stated in the Restatement of the Law of Trusts: "If money is deposited in a bank for a specific purpose, the bank is a trustee or bailee of the money if it . . . is the understanding of the parties that the money deposited is not to be used by the bank for its own purposes."

We think there is a distinction between a special deposit and one for a special or specific purpose, although the terms are sometimes used interchangeably. It is said in many cases that a special deposit creates the relation of bailor and bailee and entitles the bailor to receive back the exact thing deposited. A deposit for a spefiic purpose creates a fiduciary relationship and the purpose must be fulfilled and executed according to the terms of the agreement of deposit.

"A bailee, having merely possession of and not title to the chattel, normally has no power to transfer the chattel free of the bailor's interest. On the other hand, a trustee of a chattel has power to transfer the chattel free of the trust to a bona fide purchaser, since the trustee has title to the chattel, although holding it subject to the equity of the beneficiary, and can transfer it free of equities."

Restatement of the Law of Trusts, Volume 1, p. 20, §5d.

In the instant case the Union Trust Company, as trustee, had power to buy mortgages and high grade securities in its name and power to sell the same, but all done subject to the equities of the depositors who were the beneficiaries.

The appellee presents several tests which serve to classify the relationship of trustee and *cestui que* trust and debtor and creditor. One presented by appellee is the existence or non-existence in the claimant of the right of property. Appellee says:

"If in this case the saving investment depositors had title to the money deposited by them a trust was created. If on the other hand the Union Trust Company had title to such money, a debtor-creditor relationship was created" and to sustain this proposition cited and quoted from the case of *Cline* v. *Union Trust Company* (1935), 99 Ind. App. 296, 189 N. E. 643. We do not see the applicability (and especially the part quoted) of this case to the instant case. In the Cline case the deposit was made to indemnify a surety upon an appeal bond and it was specifically agreed by contract that said deposit was not to be segregated but was to go into the general funds of said trust company and with the right to commingle the sum deposited with the funds of the company, and 4% interest was to be paid so long as the suit appealed from was pending. The court said (p. 305):

"When the appellant made the deposit under this contract, he established the relation of debtor and creditor between the appellee and himself. That is to say, the title to the money passed from the appellant to the appellee, with the right to commingle it with its general funds and apply it to any use for which such funds were properly applicable in the regular and usual transaction of its business, appellant receiving in lieu thereof credit for the amount of the deposit to be exhausted only on

the happening of certain events. The fact that this deposit was made by the appellant for the benefit of himself and third parties, and was not to be paid to any one of them, until the happening of certain events, could not alter or change the relation of debtor and creditor which was created when the deposit was made. The appellee company became the debtor of the parties, liable to pay the money to one of them finally entitled thereto, not out of the $40,000 or substituted funds, but out of appellee's general funds." We do not disagree with the foregoing statement, but it is not applicable here. In the instant case it was expressly agreed that the deposits would not be paid out of the general funds of the company, but only out of the separated or segregated assets of the investment department. And, moreover there was to be no commingling of the funds of the investment department with the general funds of the company. The deposits received in the investment department were to be invested in first mortgage and approved collateral loans and securities, and to be kept separate from all other assets of the company. The factual situation in the instant case is entirely different from that in the Cline case.

The appellees contend that the fact that interest was to be paid the investment depositors is utterly incompatible with the relation of trustee and *cestui que* ■■ trust. We do not agree with this contention. It is a fact which is proper to consider in determining the relationship, but we do not think that the fact that interest is paid absolutely fixes the relationship as that of debtor and creditor. As said (p. 688) in the case of *Rottger, Rec.* v. *Delta Delta Delta Realty. Corp., supra,* "While the agreement to pay interest on a deposit may be a circumstance to be considered in determining the relation of the parties, this of itself is not sufficient to overcome express provisions in a contract, designating a

deposit as a special deposit to be held and used for a particular purpose." In the instant case it was expressly provided that the deposits were special deposits and for a special purpose, to wit: To invest in first mortgage and approved collateral loans, and high grade securities. In the Rottger case, *supra,* the court denied a petition to transfer and therefore accepted the foregoing statement, as quoted, as the law in this state as to the payment of interest under the particular circumstances. We do not think the provision of the contract to pay interest in the instant case changes the relationship from that of trustee and *cestui que* trust to that of debtor and creditor. It has been many times held by this court that a bank deposit may be made subject to any legal agreement which the depositor and the bank may make concerning it, so long as it does not injuriously affect the rights of innocent third parties. *Lamb* v. *Morris, supra; Rottger* v. *Delta Delta Delta, supra.* It is not shown in the instant case that the rights of third parties are injured by the contract herein.

The appellee insists that the language used in rule number three, where it said ". . . and will treat them as a special fund which, though owned by the ▉ company, is set aside to determine the order of payment of these savings investments," is inconsistent with the relationship of trustee and *cestui que* trust. When construed with all of the other provisions of the contract we think this language is susceptible of such a construction as to be in harmony therewith. In the very nature of the undertaking and plan devised it was necessary for the trust company to take all of the mortgages, loans and securities in its name. Suits might be brought in the name of the trust company to foreclose mortgages and other purposes connected with the trust. Title would be in the name of the trust company and in this sense it would be the owner for such purpose.

The business was necessarily done in the name of the trust company and in rule number three it was provided that it would invest the funds in first mortgages and approved collateral loans and high grade securities. To do this it would of course take the mortgages in its name and likewise the collateral loans and securities. Although thus taken they were to be held for the savings investment depositors, and while the naked legal title was in the trust company the beneficial title belonged to the depositors.

A literal or technical construction of an isolated or special clause should not be indulged to defeat the true meaning of a contract. The true meaning of a contract is to be ascertained from a consideration of all its provisions in order to carry out the true intention of the parties gathered from the whole instrument. *Nave* v. *Powell* (1913), 52 Ind. App. 496, 96 N. E. 395; *Globe* v. *Rutgers, etc., Ins. Co.* (1917), 65 Ind. App. 541, 116 N. E. 597. To give such a construction to rule three, as the appellee would have us do, would do violence to the true meaning of the same and this we can not do.

Under the facts as presented in this case can it be said that the "Savings Investments" deposits were general deposits under the general acceptance of the meaning of that term? We do not think so. A general deposit vests the property in the bank or trust company for all purposes, but a special deposit is limited for specific purposes. Such was the deposits in the instant case. They were received as special deposits to be known as "Savings Investments" and to be invested in first mortgage and approved collateral loans and high grade securities, all of which were to be kept segregated from the other assets of the company and the depositors were to be repaid only out of the separate assets of the investment department and not out of other funds belonging to the company. The deposits, in

our judgment, were clearly not general deposits, but were intended to be and were special deposits for specific purposes. From all the facts in the instant case it clearly appears that a trust relationship was intended to be created and this intention can not be stricken down by any legal refinement of language. As said in the case of *Citizens Loan, etc., Co.* v. *Herron* (1917), 186 Ind. 421, 427, 115 N. E. 941:

> "While it is essential to the creation of a trust that there be an explicit declaration of trust, or circumstances which show beyond doubt that a trust was intended to be created, no formal, technical or particular words are necessary, but it is sufficient if an intention to create a trust and the subject-matter, purpose, and beneficiary are stated with reasonable certainty."

We recognize the rule that a deposit made in the ordinary course of business is presumed to be general and the burden of proof is upon the depositor to overcome such presumption by proving that the deposit was made upon such terms and conditions as to constitute it a special deposit or a deposit for a specific purpose. And whether a deposit is general, special, or for a specific purpose depends upon the contract resulting from a mutual understanding and intention. In the instant case we think the evidence shows beyond doubt that the deposits were made for a specific purpose and that the relationship of trustee and *cestui que* trust was created.

The decision of the lower court was not sustained by sufficient evidence and was contrary to law.

Judgment reversed.