### MERRILL LYNCH MORTGAGE CAPITAL, INC., Plaintiff,

v.

### FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.

### No. CIV.A. 02–01123(HHK).

United States District Court, District of Columbia.

Nov. 6, 2003.

David R. Kuney, Sidley, Austin, Brown & Wood, LLP, Washington, DC, for Plaintiff.

Hugo A. Zia, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiff, Merrill Lynch Mortgage Capital, Inc. ("Merrill"), brings this action against defendant, Federal Deposit Insurance Corporation ("FDIC"), as receiver for Superior Bank, FSB ("Superior"), alleging that it wrongfully seized funds from an account to which plaintiff had legal title. In the alternative, plaintiff alleges that defendant, as receiver, wrongly applied an offset to plaintiff's uninsured deposit claim, reducing its value. Plaintiff brings the present action pursuant to 12 U.S.C. § 1821(d)(6), which provides for judicial review of administrative adjudications of claims decided by FDIC in its role as a receiver for defunct financial institutions.

Before this court are the parties. motions for summary judgment. Upon consideration of the motions, the respective opposition thereto, and the record of this case, the court concludes that plaintiff's motion for summary judgment on the issue of wrongful seizure of funds must be granted and defendant's cross-motion on the same issue must be denied.

## I. BACKGROUND

In March 2001, Merrill and Superior, a federally-insured savings and loan institution, entered into an agreement in which Merrill was to purchase, from time to time, large pools of residential mortgages originated by Superior. *See* Compl. Ex. A (Amended and Restated Purchase and Warranties Agreement, Mar. 1, 2001) ("Agreement"). The Agreement indicated that ownership and title over the mortgages, in a given pool, vested immediately with Merrill upon sale. *Id.* § 2.02. Indeed, "immediately upon transfer" of the mortgages, Merrill held "good and indefeasible title to, and [was] sole owner of, each Mortgage Loan subject to no liens, charges, mortgages, encumbrances or rights of others." *Id.* § 3.02(h).

Superior agreed to service the mortgages for Merrill, meaning that it collected principal and interest from individual mortgage borrowers, aggregated the funds, and remitted a monthly payment to Merrill, less certain expenses for servicing. Specifically, Superior was obligated to

> segregate and hold all funds collected and received pursuant to each Mortgage Loan separate and apart from any of its own funds and general assets and establish and maintain at Superior Bank FSB one or more Custodial Accounts ... in the form of time deposit or demand accounts, which may be interest bearing, titled 'Superior Bank FSB, in trust for Merrill Lynch Mortgage Capital, Inc.' Such Custodial Account shall be an Eligible Account.

*Id.* § 4.05. The Agreement defines "Eligible Account" as follows:

> Either (A) a segregated account or accounts maintained at Superior Bank FSB, (B) a segregated account or accounts maintained with [some other solvent banking institution] ..., or (C) a trust account or accounts (which shall be a "special deposit account") maintained with the trust department of a federal or state chartered depositor institution or trust company, having capital and sur-

plus of not less than $50,000,000, acting in its fiduciary capacity.

Agreement at 4.

In June 2001, after numerous other transactions under the Agreement, Merrill and Superior concluded a final sale of mortgages at a price of $60,941,127.73. Merrill withheld from the purchase price of the mortgages approximately $4,869,388 ("Offset") as security for Superior's performance of the Repurchase Obligation, which provided that Superior would buy back mortgages if they were defective according to the terms of the warranty in the Agreement.

In late July 2001, the Office of Thrift Supervision ("OTS") closed Superior and appointed as receiver FDIC, which succeeded to all of Superior's rights, titles, interests, obligations and liabilities, including those under the Agreement between Superior and Merrill. Initially, FDIC agreed to honor the Agreement and to keep servicing loans for Merrill. At the time, $10,084,567.43[1] remained in the account set up under Agreement § 4.05 ("Custodial Account") from mortgage payments received in July 2001 but not yet remitted to Merrill. In spite of its promise, in August 2001, FDIC breached the Agreement and refused to remit the $10 million remaining in the Custodial Account, effectively seizing those funds for the receivership proceedings. Merrill demanded the $10 million, arguing that the funds were a "special deposit" and therefore Merrill's sole property, not a general deposit or asset of the defunct Superior Bank. At the same time, and separately, Merrill demanded that FDIC repurchase certain mortgages because they had breached the warranty in the Agreement. FDIC refused both of Merrill's demands. Merrill then timely filed two administrative claims with FDIC, in its role as a federal agency; these claims largely repeated Merrill's earlier demands. Again, Merrill claimed that the $10 million in the Custodial Account were a "special deposit" to which Merrill had full title and that FDIC was obligated to remit the funds. Merrill also argued that FDIC was obligated to repurchase $36 million in mortgage loans, under the Agreement's warranty. In addition Merrill indicated that FDIC could apply the Offset of $4,869,388, which Merrill kept as security from the June 2001 transaction, to reduce FDIC's repurchase obligation of $36 million.

In April 2002, FDIC issued a final determination regarding Merrill's claims. With regard to the Custodial Account, it found that Merrill did not have title to the funds, the Custodial Account was a general deposit, and Merrill was not entitled to be paid off in full but had an uninsured deposit claim. That is, instead of having priority over all other claims to Superior's assets and a right to be paid in full, Merrill was to be paid a reduced pro rata share, probably about 65%, of its original deposit of about $10 million, just as Superior's other uninsured depositors would be paid according to the priority scheme in 12 U.S.C. § 1821(d)(11) of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1811 *et seq.* FDIC's final determination also stated that FDIC had breached its repurchase obligation and that Merrill was entitled to approximately $6 million in repudiation damages. On these damages, however, Merrill had the priority of a general creditor, to be paid after uninsured deposit

---

**1.** Merrill claims that the amount is $10,397,809.52. The parties agree that the difference is not material, and will allow the court to determine the final amount, if necessary. Because in a motion for summary judgment, the evidence of the non-movant is to be believed, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the court accepts FDIC's estimate for the amount left in the Custodial Account.

creditors. Since the uninsured deposit creditors were receiving only a pro rata share of their full claims, Merrill was unlikely to be paid at all on its repurchase damages. FDIC further found that Merrill's $4.8 million offset could only be applied to Merrill's uninsured deposit claim of $10 million, not its $6 million repurchase claim. FDIC therefore further reduced Merrill's uninsured deposit claim: It took the original deposit ($10,084,567), reduced it by the offset amount ($4,869,388) and applied to the remainder ($5,215,179) the pro rata share uninsured depositors were to receive-eventually, about 65% of what depositors originally had in their accounts. That is, under FDIC's determinations, Merrill eventually will receive about $3.4 million on a $10 million deposit claim once Superior's assets are liquidated. As a result, Merrill filed the present action. The bottom line, for Merrill, is as follows. If Merrill prevails on Count I, and the court finds the Customary Account to be a special deposit, Merrill will be entitled to full recovery and will receive about $10 million. If Merrill loses on Count I but prevails on Count II, Merrill will have an uninsured deposit claim but will be permitted to apply the offset against the repurchase claim (which it is unlikely to recover), and Merrill would receive about $6.55 million of its original deposit.

## II. ANALYSIS

### A. Legal Standard

Under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. Count I: Special Deposit

Deposits can be categorized as either specific or general. Specific deposits are like bailments in which the bank becomes a bailee and the depositor retains title to the things or money deposited. Special deposits are not the property of a bank. If a bank fails, special deposits do not become part of the receivership estate, and therefore special depositors are entitled to be paid in full before other creditors of the bank. *See, e.g., Union Elec. Light & Power Co. v. Cherokee Nat'l Bank of St. Louis,* 94 F.2d 517, 519–20 (8th Cir.1938); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Commercial Bank,* 218 Cal. 261, 22 P.2d 704, 709–10 (1933). General deposits do not operate as bailments; rather, the depositor gives up title when loaning the bank money, allowing the bank to use the money for profit. *Marine Bank v. Fulton Bank,* 69 U.S. 252, 256, 2 Wall. 252,

17 L.Ed. 785 (1864). Merrill argues that the Custodial Account was a special deposit; FDIC argues that it was a general deposit.

### 1. Choice of Law

 For the most part, whether an account is a special deposit or not is a matter of state law. *See Glenn Justice Mortgage Co. v. First Nat'l Bank of Fort Collins,* 592 F.2d 567, 569–70 (10th Cir. 1979) (using Colorado state law to analyze dispute over special deposit); *Rozsa v. May Davis Group, Inc.,* 152 F.Supp.2d 526, 532 (S.D.N.Y.2001) (applying New York state law to determine whether an account was a general or special deposit). This is true largely because of bailments and special deposits are governed by contract law-both exists when parties contract to form them. *See id.* at 532–33. The Agreement contains a New York choice-of-law provision that governs disputes between Merrill and Superior (or its successors). Agreement § 9.05. Therefore, New York law should determine whether the Custodial Account is a special deposit.

FDIC, however, argues that federal law-in particular rules promulgated under the FDIA and OTS regulations-preempt state laws purporting to determine whether an account is a special deposit. FDIC maintains that according to the FDIA and OTS rules, the court should defer to FDIC's determinations about the Custodial Account as a special deposit. Defendant contends that it is entitled to rely on its own interpretations of deposit account records, focusing on any evidence it wishes, in order to determine the status of the Custodial Account-and in this case, FDIC has

found the account to be a general deposit.[2] Most importantly, FDIC claims that because it is an administrative agency, its determinations are entitled to judicial deference under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.,* and *Chevron USA Inc. v. Natural Resources Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See* Def's Cross–Mot. at 28–29.

The court, however, does not merely defer to FDIC's determination that Merrill's account is a general deposit. It is generally true that "[r]eviewing courts have treated ... regulations ... dealing with deposit insurance with some deference," *Villafane–Neriz v. FDIC,* 75 F.3d 727 (1st Cir.1996). Further, the D.C. Circuit has found that FDIC insurance determinations properly before the district court are subject to *de novo* review, not judicial deference. *See Callejo v. RTC,* 17 F.3d 1497, 1501 (D.C.Cir.1994). More importantly, however, the determinations in this case do not involve deposit insurance claims; they involve the priority of uninsured claims in a liquidation proceeding. Defendant has failed to demonstrate that the FDIA and OTS rules it invokes apply to the present action. First, the rules promulgated under the FDIA, as defendant presents them, do not purport to govern the status of deposit accounts in receivership proceedings for purposes of determining priority of payment. The FDIA rules defendant cites simply indicate when an account is eligible for deposit insurance. *See* 12 C.F.R § 330.5(a)(1) ("*in determining the amount of insurance* available to each depositor, the FDIC shall

**2.** In particular, defendant cites 12 C.F.R § 330.5(a)(1), which indicates that "in determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account rec-

ords of the insured depositor institution." *See* Def.'s Cross–Mot. at 25. The regulation also allows FDIC nearly total discretion in what evidence it will or will not consider in determining account ownership. *See* 12 C.F.R § 330.5(a)(1)

presume ...") (emphasis added). Further, the policies supporting FDIC discretion in characterizing of deposits are inapposite to the present action. FDIA-based rules justify strict reliance on account records because they help FDIC estimate the number of insured accounts, pay insurance quickly, and discourage fraudulent insurance claims. *See* Def.'s Cross–Mot. at 27 (citing 63 Fed.Reg. 25,750, 25,751 (May 11, 1998)). None of these policies justifies giving FDIC discretion to decide whether an account is a special deposit in order to satisfy receivership claims. Finally, FDIC cites no cases which found insurance rules relevant to deciding whether a deposit was special.

Defendant's reliance on OTS regulations, *see* Def.'s Cross–Mot. at 29, is also misplaced. Unlike the rules promulgated under the FDIA, the OTS regulations do, on their face, purport to preempt deposit-related state laws. *See* 12 C.F.R. § 557.11 ("OTS hereby occupies the entire field of federal savings associations' deposit-related regulations."). OTS regulations, however, carve out exceptions to the federal preemption. Specifically, OTS rules do not preempt state contract and commercial laws, to the extent that they do not interfere with the deposit-related activities of depositors and are otherwise consistent with OTS regulations. *See* 12 C.F.R § 557.13. In this case, the OTS exception to preemption applies because the law of special deposits is the law of contracts, *see Rozsa*, 152 F.Supp.2d at 532–33. Further, FDIC fails to identify ways in which the state laws of special deposits are inconsistent with either deposit-related activities or other OTS regulations. As a result, under OTS rules, New York state law governs whether the Custodial Account is a general or special deposit.

### 2. Existence of a Special Deposit

Under New York law, whether a deposit is general or specific depends on

the mutual understanding and intent of the parties when the deposit is made. *See Peoples Westchester Savings Bank v. FDIC*, 961 F.2d 327, 330 (2d Cir.1992) (citing *Keyes v. Paducah & I.R. Co.*, 61 F.2d 611, 613 (6th Cir.1932)). Absent evidence of such intent, deposits are presumed to be general. *See Rozsa*, 152 F.Supp.2d at 532. A depositor can overcome this presumption by proving the existence of an agreement, express or implied, that an account was a special deposit. *See id.* at 532–33 (applying contract law to determine the existence of a special deposit, because it resembles a bailment, and because of the well-established rule that "a bailment is contingent on the existence of an express or implied contract"). The "general deposit" presumption is strong. *See, e.g., Peoples Westchester*, 961 F.2d at 332 (finding that the plaintiff "failed to rebut the strong presumption that [the disputed account] was intended to be a general deposit").

Proving the existence of a special deposit requires either an "explicit agreement ... to segregate funds" or "clear evidence of intent to create a special deposit." *Peoples Westchester*, 961 F.2d at 331. The depositor does not necessarily rebut the general deposit presumption by proving only that a deposit was intended for a specific purpose. *Swan Brewery Co., Ltd., v. U.S. Trust Co. of New York*, 832 F.Supp. 714, 719 (S.D.N.Y.1993) ("The fact that funds are deposited for a specific purpose is not determinative of the question of whether an account is general or specific."); *In re Kountze Brothers, et al.*, 27 F.Supp. 1002, 1003–04 (S.D.N.Y.1938) ("The mere fact that the funds were here deposited for a special purpose ... is quite consistent with the ordinary debtor-creditor relationship."). In many special depos-

it cases, courts sought, but did not often find, an *explicit* contract in which the bank had a duty to segregate deposited funds from its own assets. *See Peoples Westchester,* 961 F.2d at 331 (holding that deposit was not special because "documents generated in opening the [account] do not evidence that [the bank] assumed a duty to segregate those funds from its own general assets" and that "there was no explicit agreement . . . to segregate [deposited] funds"); *Keyes,* 61 F.2d at 613 (denying the existence of a special deposit because the court "fail[ed] to find in any . . . instruments . . . any indication that it was the intention . . . of the parties that the avails of the draft were to be segregated and kept as a separate fund . . . ."); *Rozsa,* 152 F.Supp.2d at 533–34 (finding no special deposit on motion to dismiss where the plaintiff failed to assert facts or argue any inferences that the defendant had assented even to an implied contract, much less and express one, to create bailment with funds); *In re Kountze Bros.,* 27 F.Supp. at 1004–05 (refusing to find special deposits when "[n]one of the reclaimants established that it ever required or requested [the debtor] to segregate the funds transmitted, from the bank's general funds, or not to use the funds in their own business."). While an implicit agreement could theoretically suffice to overcome the general deposit presumption, the existence of a written agreement-explicitly obligating the bank to segregated deposited funds and leaving legal title with the depositor-seems to be, practically, the dispositive issue in deciding whether a deposit is special.

On its face, the Agreement between Merrill and Superior indicates that the Custodial Account was a special deposit and overcomes the general deposit presumption. First, Merrill and Superior agreed explicitly that Superior was to "segregate and hold all funds collected" and to keep the mortgage funds "separate and apart from any of its own funds and general assets." *See* Agreement ¶ 4.05. Second, other portions of the Agreement indicate that immediately after a sale by Superior to Merrill of a pool of mortgages, that Merrill owned, completely and entirely, the mortgage loans. Agreement ¶¶ 2.02; 3.02(h). Furthermore the existence of a special deposit is consistent with the purpose of the Agreement-to facilitate the purchase of mortgages loans by Merrill. Through the Custodial Account, Superior aggregated the payments and then transferred the funds to Merrill monthly.

FDIC raises a litany of arguments, both legal and factual, against the proposition that the Agreement created a special deposit. The court considers the purely legal issues first, and then considers the factual issues FDIC attempts to raise.

 FDIC raises two related issues purely as a matter of law. First, FDIC argues that the parties legally could not have intended to create a special deposit because, as a bailment, there is a requirement that a "thing" be deposited and that the mortgage payments were not a "thing." Def.'s Cross–Mot. at 13–14. Indeed, FDIC argues that a special deposit can never be a bank deposit account at all. *Id.* at 14. According to FDIC, the Custodial Account would only have been a special deposit if Superior had been obligated to keep the actual mortgage payments (checks from thousands of individuals) in a box and, every month, physically transferred a mountain of checks to Merrill. To support this position, FDIC cites a letter by the Office of the Comptroller of Currency ("OCC") as indicating that special deposits are identical to safe-deposits. *See* Def.'s Cross–Mot. at 14–15 (citing Office of the Comptroller of Currency, Conditional Approval No. 479, 2001 WL 1104412 (July

27, 2001)). While there is no dispute that the Custodial Account did not involve a literal bailment, and that Superior did not keep checks to physically deliver to Merrill, FDIC's argument is without merit. The OCC letter FDIC cites does not really seem to exclude bank accounts from being special deposits. *See id.* at *6 ("Special deposits may be money, securities, or other valuables."). Furthermore, a bailment of a fungible good like money does not require that the bailee return the exact same item. *See Nat'l Corp. for Housing Partnership v. Liberty State Bank,* 836 F.2d 433, 436 (8th Cir.1988) (noting that while the ancient rule of bailment is that the identical money must be returned, "the rule requiring return of the identical item has been liberalized in the case of fungible goods."). A special deposit resembles but is not exactly a bailment; under New York law a special deposit, unlike a bailment, does not require the return of the identical "thing." *Foulkrod v. First Nat'l Bank of Waterloo,* 70 Misc.2d 616, 334 N.Y.S.2d 285, 288 (N.Y.Co.Ct.1972) (citing opinion by Justice Cardozo for the New York Court of Appeals, *Genesee Wesleyan Seminary v. U.S. Fidelity & Guaranty Co.,* 247 N.Y. 52, 55, 159 N.E. 720 (1928) (finding that while a "special deposit is sometimes said to be equivalent to a bailment," it differs in that "[s]uch a deposit may exist where the duty of the depository is to hold, not the identical bills or coins, but an equivalent sum, to be kept intact, however, for the use of the depositor.")). FDIC's apparently literal understanding of bailments and money is antiquated, and was out-of-date long before the rise of electronic banking, as the *Genesee Wesleyan Seminary* decision, rendered in 1927, demonstrates. *See id.*

▆▆ The second purely legal issue FDIC raises is that Merrill had no authority to maintain a special deposit because the Custodial Account was never a fiduciary account pursuant to the Home Owners' Loan Act, 12 U.S.C. § 1464 *et seq.,* or applicable OTS regulations and because Merrill had no authority to act as a fiduciary. *See* Def.'s Cross–Mot. at 22–23. This argument assumes that a special deposit is literally a trust. However, Superior needed no authority from an agency to act as a fiduciary or trust before it could accept special deposits, because a special deposit agreement automatically creates a trust by operation of law. *See Genesee Wesleyan Seminary,* 247 N.Y. at 55, 159 N.E. 720 (observing that a special deposit gave rise to "a trust imposed by law"); *see also Kaufman v. First Nat'l Bank of Opp, Ala.,* 493 F.2d 1070, 1072 (5th Cir.1974) ("A deposit is special rather than general when there is specific direction, or agreement express or implied, that it be special or where there are circumstances sufficient to create a trust by operation of law."). Furthermore, OTS has explicitly authorized federal savings banks to keep special deposits, without any other conditions. *See* OTS, Powers of Federal Savings Associations 2 (2001) ("[Federal savings associations] may accept special deposits."). That Superior no longer had fiduciary or trust powers when it signed the Agreement with Merrill is irrelevant. Superior had the authority to keep a special deposit so long as it agreed to do so.

In addition to its purely legal arguments, FDIC attempts to raise genuine issues of material facts, specifically with regard to the Agreement and whether it created a special deposit. It is important to note that FDIC does not address the validity of the Agreement or the fact that the explicit terms of the Agreement, at all relevant times, gave Merrill title to the mortgage loans and required Superior to segregate the mortgages "apart from any of its own funds and general assets." Rather, FDIC contests certain issues that

go to whether Merrill and Superior actually intended to create a special deposit.

■ First, FDIC argues that the language of the Agreement explicitly allowed Merrill to choose to make the Custodial Account a "special deposit account," but that Merrill did not do so. *See* Def.'s Cross–Mot. at 19. Specifically, Merrill and Superior agreed to establish the Custodial Account as an "Eligible Account" defined as

[e]ither (A) a segregated account or accounts maintained at Superior Bank FSB, (B) a segregated account or accounts maintained with [some other solvent banking institution] ..., or (C) a trust account or accounts (which shall be a "special deposit account") maintained with the trust department of a federal or state chartered depositor institution or trust company, having capital and surplus of not less than $50,000,000, acting in its fiduciary capacity.

Agreement § 4.05. The Custodial Account clearly existed under option (A), as a "segregated account" at Superior, instead of (B) or (C), both accounts at institutions other than Superior. Therefore, FDIC argues that Merrill and Superior explicitly opted not to have a special deposit because they did not choose option (C). This gives rise to a factual dispute, according to FDIC, because creates an inference that the parties to the Agreement did not intend to create a "special deposit." However, that the parties to the Agreement did not use option (C) is immaterial. Creating a special deposit is not just a matter of magic words. No case suggests that an account must be labeled "special deposit" to be one, or conversely that merely invoking the words "special deposit" suffices to create one. New York law provides discrete, specific criteria for the creation of a special deposit: A depositor and bank must enter a contract, explicit or implicit,

which creates an account which the bank is obligated to segregate from general assets, and over which the depositor retains title. *See Peoples Westchester*, 961 F.2d at 331. As the court has shown, the Agreement's express terms create a special deposit. The label "special deposit" (or its absence) lacks legal significance and does not constitute a genuine issue of material fact.

Second, FDIC argues that the Custodial Account was not a special deposit because it took the form of a "normal" bank account; as such, Superior was free to use the funds as it would a general deposit. Specifically, FDIC identifies several undisputed facts about the Custodial Account: (1) that the Agreement indicated it was to be "in the form of time deposit or demand accounts"; (2) that the Agreement said that the account "may be interest bearing," as a general deposit would be; (3) that the Custodial Account, according to the signature card, was officially a business checking account; and (4) that Superior had the right to remove from the account fees and sundry expenses for mortgage servicing. *See* Def.'s Cross–Mot. at 17–21, 23–24, 24–29.

■ Most of these arguments are the corollaries of FDIC's assertion, already debunked, that a special deposit must be a literal bailment of a thing. If a special deposit of money need not be a literal bailment (*i.e.,* in a safe-deposit box), then it must be that a valid special deposit can keep money in a bank account. The fact that the Custodial Account was, or could have been, a time deposit or demand account, interest bearing, or a business checking account is not material and does not affect the determination that the Custodial Account was a special deposit. *See Fuste v. Eurobank & Trust Co. (In re Almacenes Gigante, Inc.),* 159 B.R. 638 (Bkrtcy.D.P.R.1993) (finding that a time deposit could be a special deposit); *First*

*Nat'l Bank of Ranger v. Price,* 262 S.W. 797, 800 (Tex.Civ.App.1924) (finding that a demand account can be special deposit); *Sindlinger v. Dep't of Fin. Insts. of Indiana,* 210 Ind. 83, 199 N.E. 715, 724 (1936) (finding that agreement to pay interest on deposit does not overcome express agreement to form special deposit); *Hodge v. N. Trust Bank of Texas, N.A.,* 54 S.W.3d 518, 522 (Tex.App.2001) (finding that a certificate of deposit, an interest bearing account, could be a special deposit). The form of the account (checking, interest-bearing, etc.) does not matter. The critical point is whether a bank and a depositor have agreed that an account is to be a special deposit or not. *See Hodge,* 54 S.W.3d at 522 ("A certificate of deposit can be either a general or special deposit, depending on the agreement between the bank and the depositor.... It is clear from the court order that the CD in this case was a special deposit."). Furthermore, a bank may withdraw fees and other expenses from an account without having to take title to the account; such limited withdrawals do not transfer title over the property in the account to the bank. *See In re Int'l Milling Co.,* 259 N.Y. 77, 80, 81–83, 181 N.E. 54 (N.Y.1932) (holding that bank's deduction of fee from bailment did not impair bailment); *In re De Wind,* 144 Misc. 665, 259 N.Y.S. 554, 557 (N.Y.Sur. 1932) (finding that trust company holding special deposit funds on behalf of owners was authorized to deduct commission fees).

■■■ These facts might help cast doubt on the existence of an *implied* agreement to create a special deposit. They would raise a genuine issue of material fact, and defeat summary judgment for Merrill, because usually "the need to resolve inferences regarding intent [to form a bailment contract] often precludes summary judgment." *Swan Brewery,* 832 F.Supp. at 718. In analyzing an alleged special deposit formed by *implied* agreement, the facts FDIC has recited would be relevant because "[c]ourts look to all of the circumstances surrounding the creation of an account to ascertain whether the depositor and the depository institution mutually intended the account to be special or general." *Id.* at 719. However, a court need not resolve inferences about intent by reference to all "circumstances surrounding the creation of an account" when an explicit agreement exists to express the intent of the parties. *See Sindlinger,* 199 N.E. at 724 ("While the agreement to pay interest on a deposit may be a circumstance to consider in determining the relation of the parties, this of itself is not sufficient to overcome express provisions in a contract, designated a deposit as a special deposit to be held and used for a particular purpose.").

■■■ Furthermore, matters largely relevant to a bank's internal accounting or categorization of deposits do not affect the existence and validity of a special deposit, once a bank and depositor have agreed to one. *See In re Mechanics Trust Co.,* 19 Pa. D. & C. 468, 472 (1933) (finding that a bank's internal accounting procedures do not create a debtor-creditor relationship where a bank and another party have already agreed to a trust relationship). The controlling factor is what a bank was contractually obligated to do with funds in an account. Once a bank accepts a special deposit, the fact that the bank treats the account as if it had title to the funds (*i.e.,* by using them in a way that requires title, such as loaning the funds), does not turn the account into a general deposit-such actions merely constitute a violation of the bank's obligations. *See People v. City Bank of Rochester,* 96 N.Y. 32 (N.Y.1884) (finding that an account created for a specific object "does not depend on ... incidental circumstances" and that once the

funds "were impressed with a trust, . . . no change of them into any other shape could divest it so as to give the bank or its receiver any different or more valid claim in respect to them than the bank had before the conversion."); *see also Foulkrod*, 334 N.Y.S.2d at ——, 70 Misc.2d at 617 ("When a customer indicates that a deposit is made for a special purpose, the bank, by accepting the deposit, agrees to devote the fund to that purpose.") (internal quotation marks and citations omitted). Were the law otherwise, a bank could unilaterally frustrate the terms of an explicit special deposit agreement simply by treating the account as a general deposit.

The reasoning in *Mechanics Trust, City Bank of Rochester*, and *Foulkrod* are all consistent with the case law indicating that the existence of an express agreement is the critical determination for whether an account is a general deposit, giving rise to a creditor-debtor relationship, or a special deposit, giving rise to a bailor-bailee type of relationship. The Agreement explicitly creates the substantive rights and duties that constitute a special deposit. FDIC fails to demonstrate that the litany of issues it raises a genuine issue of material fact with regard to the expressed intent of Merrill and Superior to create a special deposit.

As a result, the court grants Merrill summary judgment with regard to Count I and finds that the Custodial Account was a special deposit, which in the receivership proceedings of Superior entitles Merrill to full recovery and priority over uninsured deposit claims.

## C. Counts II & III: Setoff and Declaratory Relief

Merrill requests summary judgment on Counts II and III only in the alternative to relief under Count I. The court, therefore, need not decide the issues under Counts II and III, because these requests for relief assume that the court has found the funds in the Custodial Account to be an uninsured deposit claim subject to a pro rata recovery, not a special deposit subject to full recovery. In any case, Merrill has conceded that the declaratory relief it seeks under Count III is moot and should be dismissed. *See* Pl.'s Reply at 51.

## CONCLUSION

The Agreement expresses the shared intent of Merrill and Superior to make the Custodial Account a special deposit. None of the arguments made by FDIC raises a genuine issue of material fact about the existence of a special deposit. As a result, Merrill's motion for summary judgment must be granted and FDIC's cross motion for summary judgment must be denied. An appropriate order accompanies this memorandum opinion.

## JUDGMENT

For the reasons set forth in the Memorandum Opinion issued on this date, the court grants judgment for plaintiff. Accordingly, it is this 6th day of November, 2003, hereby

**ORDERED AND ADJUDGED** that the funds in the Custodial Account constitute a special deposit to which plaintiff Merrill Lynch holds full title, and that defendant FDIC is therefore obliged to remit the full value of the Custodial Account to Merrill, less any amounts FDIC has already returned.